(Slip Opinion) OCTOBER TERM, 2007 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## ENGQUIST *v.* OREGON DEPARTMENT OF AGRICULTURE ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 07–474.   Argued April 21, 2008—Decided June 9, 2008

Petitioner Engquist, an Oregon public employee, filed suit against respondents—her agency, her supervisor, and a co-worker—asserting, *inter alia,* claims under the Equal Protection Clause: She alleged she had been discriminated against based on her race, sex, and national origin, and she also brought a so-called "class-of-one" claim, alleging that she was fired not because she was a member of an identified class (unlike her race, sex, and national origin claims), but simply for arbitrary, vindictive, and malicious reasons.  The jury rejected the class-membership equal protection claims, but found for Engquist on her class-of-one claim.  The Ninth Circuit reversed in relevant part.  Although recognizing that this Court had upheld a class-of-one equal protection challenge to state legislative and regulatory action in *Village of Willowbrook* v. *Olech*, 528 U. S. 562, the court below emphasized that this Court has routinely afforded government greater leeway when it acts as employer rather than regulator.  The Court concluded that extending the class-of-one theory to the public-employment context would lead to undue judicial interference in state employment practices and invalidate public at-will employment.

*Held:* The class-of-one theory of equal protection does not apply in the public employment context.  Pp. 4–16.

  (a) There is a crucial difference between the government exercising "the power to regulate or license, as lawmaker," and acting "as proprietor, to manage [its] internal operation."  *Cafeteria & Restaurant Workers* v. *McElroy*, 367 U. S. 886, 896.   Thus, in the public-employment context, the Court has recognized that government has significantly greater leeway in its dealings with citizen employees

than in bringing its sovereign power to bear on citizens at large. See, *e.g., O'Connor* v. *Ortega*, 480 U. S. 709, 721–722. The relevant precedent establishes two main principles: First, government employees do not lose their constitutional rights when they go to work, but those rights must be balanced against the realities of the employment context. See, *e.g., id.,* at 721. Second, in striking the appropriate balance, the Court considers whether the claimed employee right implicates the relevant constitutional provision's basic concerns, or whether the right can more readily give way to the requirements of the government as employer. See, *e.g., Connick* v. *Myers*, 461 U. S. 138. Pp. 4–8.

   (b) The Court's equal protection jurisprudence has typically been concerned with governmental classifications that "affect some groups of citizens differently than others." *McGowan* v. *Maryland*, 366 U. S. 420, 425. *Olech* did recognize that a class-of-one equal protection claim can in some circumstances be sustained. Its recognition of that theory, however, was not so much a departure from the principle that the Equal Protection Clause is concerned with arbitrary government classification, as it was an application of that principle to the facts in that case: The government singled Olech out with regard to its regulation of property, and the cases upon which the Court relied concerned property assessment and taxation schemes that were applied in a singular way to particular citizens. What seems to have been significant in *Olech* and the cited cases was the existence of a clear standard against which departures, even for a single plaintiff, could be readily assessed. This differential treatment raised a concern of arbitrary classification, and therefore required that the State provide a rational basis for it. There are some forms of state action, however, which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments. In such cases treating like individuals differently is an accepted consequence of the discretion granted to governmental officials. This principle applies most clearly in the employment context, where decisions are often subjective and individualized, resting on a wide array of factors that are difficult to articulate and quantify. Unlike the context of arm's-length regulation, such as in *Olech*, treating seemingly similarly situated individuals differently in the employment context is par for the course. It is no proper challenge to what in its nature is a subjective and individualized decision that it was subjective and individualized. That the Court has never found the Equal Protection Clause implicated in this area is not surprising, given the historical understanding of the at-will nature of government employment. See, *e.g., Cafeteria & Restaurant Workers* v. *McElroy*, 367 U. S. 886, 896. Recognition of a claim that the State treated an employee differently

Syllabus

from others for a bad reason, or for no reason at all, is simply contrary to the at-will concept. The Constitution does not require repudiating that familiar doctrine. Finally, the Court is guided, as in the past, by the "common-sense realization that government offices could not function if every employment decision became a constitutional matter." *Connick*, *supra,* at 143. If class-of-one claims were recognized in the employment context, any personnel action in which a wronged employee can conjure up a claim of differential treatment would suddenly become the basis for a federal constitutional claim. The Equal Protection Clause does not require "[t]his displacement of managerial discretion by judicial supervision." *Garcetti* v. *Ceballos*, 547 U. S. 410, 423. Pp. 8–16.

478 F. 3d 985, affirmed.

ROBERTS, C. J., delivered the opinion of the Court, in which SCALIA, KENNEDY, THOMAS, BREYER, and ALITO, JJ., joined. STEVENS, J., filed a dissenting opinion, in which SOUTER and GINSBURG, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 07–474

ANUP ENGQUIST, PETITIONER *v.* OREGON DEPARTMENT OF AGRICULTURE ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 9, 2008]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

The question in this case is whether a public employee can state a claim under the Equal Protection Clause by alleging that she was arbitrarily treated differently from other similarly situated employees, with no assertion that the different treatment was based on the employee's membership in any particular class. We hold that such a "class-of-one" theory of equal protection has no place in the public employment context.

I

Anup Engquist, the petitioner in this case, was hired in 1992 by Norma Corristan to be an international food standard specialist for the Export Service Center (ESC), a laboratory within the Oregon Department of Agriculture (ODA). During the course of her employment, Engquist experienced repeated problems with Joseph Hyatt, another ODA employee, complaining to Corristan that he had made false statements about her and otherwise made her life difficult. Corristan responded by directing Hyatt to attend diversity and anger management training.

In 2001, John Szczepanski, an assistant director of ODA, assumed responsibility over ESC, supervising Corristan, Hyatt, and Engquist. Szczepanski told a client that he could not "control" Engquist, and that Engquist and Corristan "would be gotten rid of." When Engquist and Hyatt both applied for a vacant managerial post within ESC, Szczepanski chose Hyatt despite Engquist's greater experience in the relevant field. Later that year, during a round of across-the-board budget cuts in Oregon, Szczepanski eliminated Corristan's position. Finally, on January 31, 2002, Engquist was informed that her position was being eliminated because of reorganization. Engquist's collective-bargaining agreement gave her the opportunity either to "bump" to another position at her level, or to take a demotion. She was found unqualified for the only other position at her level and declined a demotion, and was therefore effectively laid off.

Engquist subsequently brought suit in the United States District Court for the District of Oregon against ODA, Szczepanski, and Hyatt, all respondents here, alleging violations of federal antidiscrimination statutes, the Equal Protection and Due Process Clauses of the Fourteenth Amendment, and state law. As to Engquist's equal protection claim, she alleged that the defendants discriminated against her on the basis of her race, sex, and national origin. She also brought what is known as a "class-of-one" equal protection claim, alleging that she was fired not because she was a member of an identified class (unlike her race, sex, and national origin claims), but simply for "arbitrary, vindictive, and malicious reasons." App. 10.

The District Court granted the respondents' motion for summary judgment as to some of Engquist's claims, but allowed others to go forward, including each of the equal protection claims. As relevant to this case, the District Court found Engquist's class-of-one equal protection claim

legally viable, deciding that the class-of-one theory was fully applicable in the employment context. Civ. No. 02–1637–AS (D. Ore., Sept. 14, 2004), App. 58, 2004 WL 2066748, *5. The court held that Engquist could succeed on that theory if she could prove "that she was singled out as a result of animosity on the part of Hyatt and Szczepanski"—*i.e.*, "that their actions were spiteful efforts to punish her for reasons unrelated to any legitimate state objective"—and if she could demonstrate, on the basis of that animosity, that "she was treated differently than others who were similarly situated." *Ibid.*

The jury rejected Engquist's claims of discrimination for membership in a suspect class—her race, sex, and national origin claims—but found in her favor on the class-of-one claim. Specifically, the jury found that Hyatt and Szczepanski "intentionally treat[ed] [Engquist] differently than others similarly situated with respect to the denial of her promotion, termination of her employment, or denial of bumping rights without any rational basis and solely for arbitrary, vindictive or malicious reasons." App. to Pet. for Cert. 3–4. The jury also found for Engquist on several of her other claims, and awarded her $175,000 in compensatory damages and $250,000 in punitive damages.

The Court of Appeals reversed in relevant part. It recognized that this Court had upheld a class-of-one equal protection challenge to state legislative and regulatory action in *Village of Willowbrook* v. *Olech*, 528 U. S. 562 (2000) (*per curiam*). 478 F. 3d 985, 992–993 (CA9 2007). The court below also acknowledged that other Circuits had applied *Olech* in the public employment context, *id.*, at 993 (citing cases), but it disagreed with those courts on the ground that our cases have routinely afforded government greater leeway when it acts as employer rather than regulator, *id.*, at 993–996. The court concluded that extending the class-of-one theory of equal protection to the public employment context would lead to undue judicial

interference in state employment practices and "completely invalidate the practice of public at-will employment." *Id.*, at 995. The court accordingly held that the class-of-one theory is "inapplicable to decisions made by public employers with regard to their employees." *Id.*, at 996.

Judge Reinhardt dissented, "agree[ing] with the other circuits that the class-of-one theory of equal protection is applicable to public employment decisions." *Id.*, at 1010. We granted certiorari to resolve this disagreement in the lower courts, 552 U. S. __ (2008), and now affirm.

## II

Engquist argues that the Equal Protection Clause forbids public employers from irrationally treating one employee differently from others similarly situated, regardless of whether the different treatment is based on the employee's membership in a particular class. She reasons that in *Olech*, *supra*, we recognized in the regulatory context a similar class-of-one theory of equal protection, Brief for Petitioner 14–15; that the Equal Protection Clause protects individuals, not classes, *id.*, at 15–17; that the Clause proscribes "discrimination arising not only from a legislative act but also from the conduct of an administrative official," *id.*, at 17; and that the Constitution applies to the State not only when it acts as regulator, but also when it acts as employer, *id.*, at 23–29. Thus, Engquist concludes that class-of-one claims can be brought against public employers just as against any other state actors, *id.*, at 29–32, and that differential treatment of government employees—even when not based on membership in a class or group—violates the Equal Protection Clause unless supported by a rational basis, *id.*, at 32, 39–45.

We do not quarrel with the premises of Engquist's argument. It is well settled that the Equal Protection

Opinion of the Court

Clause "protect[s] persons, not groups," *Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200, 227 (1995) (emphasis omitted), and that the Clause's protections apply to administrative as well as legislative acts, see, *e.g., Raymond* v. *Chicago Union Traction Co.*, 207 U. S. 20, 35–36 (1907). It is equally well settled that States do not escape the strictures of the Equal Protection Clause in their role as employers. See, *e.g., New York City Transit Authority* v. *Beazer*, 440 U. S. 568 (1979); *Harrah Independent School Dist.* v. *Martin*, 440 U. S. 194 (1979) (*per curiam*); *Massachusetts Bd. of Retirement* v. *Murgia*, 427 U. S. 307 (1976) (*per curiam*). We do not, however, agree that Engquist's conclusion follows from these premises. Our traditional view of the core concern of the Equal Protection Clause as a shield against arbitrary classifications, combined with unique considerations applicable when the government acts as employer as opposed to sovereign, lead us to conclude that the class-of-one theory of equal protection does not apply in the public employment context.

## A

We have long held the view that there is a crucial difference, with respect to constitutional analysis, between the government exercising "the power to regulate or license, as lawmaker," and the government acting "as proprietor, to manage [its] internal operation." *Cafeteria & Restaurant Workers* v. *McElroy*, 367 U. S. 886, 896 (1961). This distinction has been particularly clear in our review of state action in the context of public employment. Thus, "the government as employer indeed has far broader powers than does the government as sovereign." *Waters* v. *Churchill*, 511 U. S. 661, 671 (1994) (plurality opinion). "[T]he extra power the government has in this area comes from the nature of the government's mission as employer. Government agencies are charged by law with doing particular tasks. Agencies hire employees to help do those

tasks as effectively and efficiently as possible." *Id.*, at 674–675.  See also *Connick* v. *Myers*, 461 U. S. 138, 150–151 (1983) (explaining that the government has a legitimate interest "in 'promot[ing] efficiency and integrity in the discharge of official duties, and [in] maintain[ing] proper discipline in the public service'" (quoting *Ex parte Curtis*, 106 U. S. 371, 373 (1882) (alterations in original))). "The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer." *Waters*, *supra*, at 675 (plurality opinion).  Given the "common-sense realization that government offices could not function if every employment decision became a constitutional matter," *Connick*, *supra*, at 143, "constitutional review of government employment decisions must rest on different principles than review of . . . restraints imposed by the government as sovereign," *Waters*, *supra*, at 674 (plurality opinion).

In light of these basic principles, we have often recognized that government has significantly greater leeway in its dealings with citizen employees than it does when it brings its sovereign power to bear on citizens at large. Thus, for example, we have held that the Fourth Amendment does not require public employers to obtain warrants before conducting a search of an employee's office. *O'Connor* v. *Ortega*, 480 U. S. 709, 721–722 (1987) (plurality opinion).  See also *id.*, at 732 (SCALIA, J., concurring in judgment).  Although we recognized that the "legitimate privacy interests of public employees in the private objects they bring to the workplace may be substantial," we found that "[a]gainst these privacy interests . . . must be balanced the realities of the workplace, which strongly suggest that a warrant requirement would be unworkable." *Id.,* at 721 (plurality opinion).  We have also found that the Due Process Clause does not protect a public employee

from discharge, even when such discharge was mistaken or unreasonable. See *Bishop* v. *Wood*, 426 U. S. 341, 350 (1976) ("The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions").

Our public-employee speech cases are particularly instructive. In *Pickering* v. *Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U. S. 563, 568 (1968), we explained that, in analyzing a claim that a public employee was deprived of First Amendment rights by her employer, we must seek "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."

We analyzed the contours of this balance more fully in *Connick* v. *Myers*, *supra*. We explained that the First Amendment protects public-employee speech only when it falls within the core of First Amendment protection— speech on matters of public concern. We recognized that the "'First Amendment does not protect speech and assembly only to the extent it can be characterized as political,'" and that the government therefore could not generally prohibit or punish, in its capacity as sovereign, speech on the ground that it does not touch upon matters of public concern, *id.*, at 147 *(*quoting *Mine Workers* v. *Illinois Bar Assn.*, 389 U. S. 217, 223 (1967)). But "[w]hen employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices." *Connick*, 461 U. S., at 146. As we explained, "absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Id.*, at 147 (citing *Bishop*, *supra,* at 349–350).

Our precedent in the public-employee context therefore establishes two main principles: First, although government employees do not lose their constitutional rights when they accept their positions, those rights must be balanced against the realities of the employment context. Second, in striking the appropriate balance, we consider whether the asserted employee right implicates the basic concerns of the relevant constitutional provision, or whether the claimed right can more readily give way to the requirements of the government as employer. With these principles in mind, we come to the question whether a class-of-one theory of equal protection is cognizable in the public employment context.

B

Our equal protection jurisprudence has typically been concerned with governmental classifications that "affect some groups of citizens differently than others." *McGowan* v. *Maryland*, 366 U. S. 420, 425 (1961). See, *e.g., Ross* v. *Moffitt*, 417 U. S. 600, 609 (1974) ("'Equal Protection' . . . emphasizes disparity in treatment by a State between classes of individuals whose situations are arguably indistinguishable"); *San Antonio Independent School Dist.* v. *Rodriguez*, 411 U. S. 1, 60 (1973) (Stewart, J., concurring) ("[T]he basic concern of the Equal Protection Clause is with state legislation whose purpose or effect is to create discrete and objectively identifiable classes"). Plaintiffs in such cases generally allege that they have been arbitrarily classified as members of an "identifiable group." *Personnel Administrator of Mass.* v. *Feeney*, 442 U. S. 256, 279 (1979).

Engquist correctly argues, however, that we recognized in *Olech* that an equal protection claim can in some circumstances be sustained even if the plaintiff has not alleged class-based discrimination, but instead claims that she has been irrationally singled out as a so-called "class

of one." In *Olech*, a property owner had asked the village of Willowbrook to connect her property to the municipal water supply. Although the village had required only a 15-foot easement from other property owners seeking access to the water supply, the village conditioned Olech's connection on a grant of a 33-foot easement. Olech sued the village, claiming that the village's requirement of an easement 18 feet longer than the norm violated the Equal Protection Clause. Although Olech had not alleged that the village had discriminated against her based on membership in an identifiable class, we held that her complaint stated a valid claim under the Equal Protection Clause because it alleged that she had "been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." 528 U. S., at 564 (citing *Sioux City Bridge Co.* v. *Dakota County*, 260 U. S. 441 (1923), and *Allegheny Pittsburgh Coal Co.* v. *Commission of Webster Cty.*, 488 U. S. 336 (1989)).

Recognition of the class-of-one theory of equal protection on the facts in *Olech* was not so much a departure from the principle that the Equal Protection Clause is concerned with arbitrary government classification, as it was an application of that principle. That case involved the government's regulation of property. Similarly, the cases upon which the Court in *Olech* relied concerned property assessment and taxation schemes. See *Allegheny Pittsburgh, supra*; *Sioux City Bridge, supra.* We expect such legislative or regulatory classifications to apply "without respect to persons," to borrow a phrase from the judicial oath. See 28 U. S. C. §453. As we explained long ago, the Fourteenth Amendment "requires that all persons subjected to . . . legislation shall be treated alike, under like circumstances and conditions, both in the privileges conferred and in the liabilities imposed." *Hayes* v. *Missouri*, 120 U. S. 68, 71–72 (1887). When those who appear simi-

larly situated are nevertheless treated differently, the Equal Protection Clause requires at least a rational reason for the difference, to assure that all persons subject to legislation or regulation are indeed being "treated alike, under like circumstances and conditions." Thus, when it appears that an individual is being singled out by the government, the specter of arbitrary classification is fairly raised, and the Equal Protection Clause requires a "rational basis for the difference in treatment." *Olech*, 528 U. S., at 564.

What seems to have been significant in *Olech* and the cases on which it relied was the existence of a clear standard against which departures, even for a single plaintiff, could be readily assessed. There was no indication in *Olech* that the zoning board was exercising discretionary authority based on subjective, individualized determinations—at least not with regard to easement length, however typical such determinations may be as a general zoning matter. See *id.,* at 565 (BREYER, J., concurring in result). Rather, the complaint alleged that the board consistently required only a 15-foot easement, but subjected Olech to a 33-foot easement. This differential treatment raised a concern of arbitrary classification, and we therefore required that the State provide a rational basis for it.

In *Allegheny Pittsburgh*, cited by the *Olech* Court, the applicable standard was market value, but the county departed from that standard in basing some assessments on quite dated purchase prices. Again, there was no suggestion that the "dramatic differences in valuation" for similar property parcels, 488 U. S., at 341, were based on subjective considerations of the sort on which appraisers often rely, see *id.*, at 338–342, 345. *Sioux City Bridge*, also cited in *Olech*, was the same sort of case, recognizing an equal protection claim when one taxpayer's property was assessed at 100 percent of its value, while all other prop-

erty was assessed at 55 percent, without regard to articulated differences in the properties. See 260 U. S., at 445–447.

There are some forms of state action, however, which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments. In such cases the rule that people should be "treated alike, under like circumstances and conditions" is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted. In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise.

Suppose, for example, that a traffic officer is stationed on a busy highway where people often drive above the speed limit, and there is no basis upon which to distinguish them. If the officer gives only one of those people a ticket, it may be good English to say that the officer has created a class of people that did not get speeding tickets, and a "class of one" that did. But assuming that it is in the nature of the particular government activity that not all speeders can be stopped and ticketed, complaining that one has been singled out for no reason does not invoke the fear of improper government classification. Such a complaint, rather, challenges the legitimacy of the underlying action itself—the decision to ticket speeders under such circumstances. Of course, an allegation that speeding tickets are given out on the basis of race or sex would state an equal protection claim, because such discriminatory classifications implicate basic equal protection concerns. But allowing an equal protection claim on the ground that a ticket was given to one person and not others, even if for no discernible or articulable reason, would be incompatible with the discretion inherent in the challenged action. It is no proper challenge to what in its nature is a subjective,

individualized decision that it was subjective and individualized.

This principle applies most clearly in the employment context, for employment decisions are quite often subjective and individualized, resting on a wide array of factors that are difficult to articulate and quantify. As Engquist herself points out, "[u]nlike the zoning official, the public employer often must take into account the individual personalities and interpersonal relationships of employees in the workplace. The close relationship between the employer and employee, and the varied needs and interests involved in the employment context, mean that considerations such as concerns over personality conflicts that would be unreasonable as grounds for 'arm's-length' government decisions (*e.g.*, zoning, licensing) may well justify different treatment of a public employee." Brief for Petitioner 48. Unlike the context of arm's-length regulation, such as in *Olech*, treating seemingly similarly situated individuals differently in the employment context is par for the course.

Thus, the class-of-one theory of equal protection—which presupposes that like individuals should be treated alike, and that to treat them differently is to classify them in a way that must survive at least rationality review—is simply a poor fit in the public employment context. To treat employees differently is not to classify them in a way that raises equal protection concerns. Rather, it is simply to exercise the broad discretion that typically characterizes the employer-employee relationship. A challenge that one has been treated individually in this context, instead of like everyone else, is a challenge to the underlying nature of the government action.

Of course, that is not to say that the Equal Protection Clause, like other constitutional provisions, does not apply to public employers. Indeed, our cases make clear that the Equal Protection Clause is implicated when the govern-

ment makes class-based decisions in the employment context, treating distinct groups of individuals categorically differently. See, *e.g., Beazer*, 440 U. S., at 593 (upholding city's exclusion of methadone users from employment under rational-basis review); *Martin*, 440 U. S., at 199–201 (classification between teachers who had complied with a continuing-education requirement and those who had not is rational and does not violate the Equal Protection Clause); *Murgia*, 427 U. S., at 314–317 (upholding a mandatory retirement age—a classification based on age—under rational-basis review). The dissent's broad statement that we "excep[t] state employees from the Fourteenth Amendment's protection against unequal and irrational treatment at the hands of the State," *post*, at 2 (opinion of STEVENS, J.), is thus plainly not correct. But we have never found the Equal Protection Clause implicated in the specific circumstance where, as here, government employers are alleged to have made an individualized, subjective personnel decision in a seemingly arbitrary or irrational manner.

This is not surprising, given the historical understanding of the nature of government employment. We long ago recognized the "settled principle that government employment, in the absence of legislation, can be revoked at the will of the appointing officer." *McElroy*, 367 U. S., at 896. The basic principle of at-will employment is that an employee may be terminated for a "'good reason, bad reason, or no reason at all.'" Reply Brief for Petitioner 27. See *Andrews* v. *Louisville & Nashville R. Co.*, 406 U. S. 320, 324 (1972) ("[T]he very concept of 'wrongful discharge' implies some sort of statutory or contractual standard that modifies the traditional common-law rule that a contract of employment is terminable by either party at will"). Thus, "[w]e have never held that it is a violation of the Constitution for a government employer to discharge an employee based on substantively incorrect information."

*Waters*, 511 U. S., at 679 (plurality opinion). See also *Connick*, 461 U. S., at 146–147 ("[O]rdinary dismissals from government service . . . are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable" (citing *Board of Regents of State Colleges* v. *Roth*, 408 U. S. 564 (1972); *Perry* v. *Sindermann*, 408 U. S. 593 (1972); and *Bishop*, 426 U. S. 341)). "And an at-will government employee . . . generally has no claim based on the Constitution at all." *Waters*, *supra*, at 679 (plurality opinion). See, *e.g., Bishop*, *supra*, at 349–350.

State employers cannot, of course, take personnel actions that would independently violate the Constitution. See *supra*, at 5–8. But recognition of a class-of-one theory of equal protection in the public employment context— that is, a claim that the State treated an employee differently from others for a bad reason, or for no reason at all— is simply contrary to the concept of at-will employment. The Constitution does not require repudiating that familiar doctrine.

To be sure, Congress and all the States have, for the most part, replaced at-will employment with various statutory schemes protecting public employees from discharge for impermissible reasons. See, *e.g.,* 5 U. S. C. §2302(b)(10) (2006 ed.) (supervisor of covered federal employee may not "discriminate . . . on the basis of conduct which does not adversely affect the performance of the employee or applicant or the performance of others"). See also Brief for United States as *Amicus Curiae* 20–21. But a government's decision to limit the ability of public employers to fire at will is an act of legislative grace, not constitutional mandate.

Indeed, recognizing the sort of claim Engquist presses could jeopardize the delicate balance governments have struck between the rights of public employees and "the government's legitimate purpose in 'promot[ing] efficiency

and integrity in the discharge of official duties, and [in] maintain[ing] proper discipline in the public service.'" *Connick, supra,* at 151 (quoting *Ex parte Curtis*, 106 U. S., at 373; alterations in original). Thus, for example, although most federal employees are covered by the Civil Service Reform Act of 1978, Pub. L. 95–454, Congress has specifically excluded some groups of employees from its protection, see, *e.g.,* 5 U. S. C. §2302(a)(2)(C) (2006 ed.) (excluding from coverage, *inter alia*, the Federal Bureau of Investigation, the Central Intelligence Agency, and the Defense Intelligence Agency). Were we to find that the Equal Protection Clause subjects the Government to equal protection review for every allegedly arbitrary employment action, we will have undone Congress's (and the States') careful work.

In concluding that the class-of-one theory of equal protection has no application in the public employment context—and that is all we decide—we are guided, as in the past, by the "common-sense realization that government offices could not function if every employment decision became a constitutional matter." *Connick, supra,* at 143. If, as Engquist suggests, plaintiffs need not claim discrimination on the basis of membership in some class or group, but rather may argue only that they were treated by their employers worse than other employees similarly situated, any personnel action in which a wronged employee can conjure up a claim of differential treatment will suddenly become the basis for a federal constitutional claim. Indeed, an allegation of arbitrary differential treatment could be made in nearly every instance of an assertedly wrongful employment action—not only hiring and firing decisions, but any personnel action, such as promotion, salary, or work assignments—on the theory that other employees were not treated wrongfully. See 478 F. 3d, at 995. On Engquist's view, every one of these employment decisions by a government employer would

become the basis for an equal protection complaint.

Engquist assures us that accepting her view would not pose too much of a practical problem. Specifically, Engquist argues that a plaintiff in a class-of-one employment case would have to prove that the government's differential treatment was intentional, that the plaintiff was treated differently from other similarly situated persons, and that the unequal treatment was not rationally related to a legitimate government purpose. Brief for Petitioner 36–39. And because a "governmental employment decision is . . . rational whenever the discrimination relates to a legitimate government interest," it is in practice "difficult for plaintiffs to show that the government has failed to meet this standard." *Id.*, at 41. JUSTICE STEVENS makes a similar argument, stating "that all but a handful [of class-of-one complaints] are dismissed well in advance of trial." *Post*, at 7.

We agree that, even if we accepted Engquist's claim, it would be difficult for a plaintiff to show that an employment decision is arbitrary. But this submission is beside the point. The practical problem with allowing class-of-one claims to go forward in this context is not that it will be too easy for plaintiffs to prevail, but that governments will be forced to defend a multitude of such claims in the first place, and courts will be obliged to sort through them in a search for the proverbial needle in a haystack. The Equal Protection Clause does not require "[t]his displacement of managerial discretion by judicial supervision." *Garcetti* v. *Ceballos*, 547 U. S. 410, 423 (2006).

In short, ratifying a class-of-one theory of equal protection in the context of public employment would impermissibly "constitutionalize the employee grievance." *Connick*, 461 U. S., at 154. "The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies." *Bishop, supra,* at 349. Public employees typically have a variety of

protections from just the sort of personnel actions about which Engquist complains, but the Equal Protection Clause is not one of them.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 07–474

_____

## ANUP ENGQUIST, PETITIONER *v.* OREGON DEPARTMENT OF AGRICULTURE ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 9, 2008]

JUSTICE STEVENS, with whom JUSTICE SOUTER and JUSTICE GINSBURG join, dissenting.

Congress has provided a judicial remedy for individuals whose federal constitutional rights are violated by state action, 42 U. S. C. §1983.[1]  In prior cases, we have refused to craft *new* remedies for the violation of constitutional rights of federal employees, *Bush* v. *Lucas,* 462 U. S. 367 (1983), or for the nonconstitutional claims of state employees, *Bishop* v. *Wood,* 426 U. S. 341 (1976).  But refusal to give effect to the congressionally mandated remedy embodied in §1983 would be impermissible.  To avoid this result, the Court today concludes that Engquist suffered no constitutional violation at all, and that there was thus no harm to be remedied.  In so holding, the Court—as it did in *Garcetti* v. *Ceballos*, 547 U. S. 410 (2006)—carves a novel exception out of state employees' constitutional rights.  In *Garcetti*, the Court created a new substantive

_____

[1] Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

rule excepting a category of speech by state employees from the protection of the First Amendment. Today, the Court creates a new substantive rule excepting state employees from the Fourteenth Amendment's protection against unequal and irrational treatment at the hands of the State. Even if some surgery were truly necessary to prevent governments from being forced to defend a multitude of equal protection "class of one" claims, the Court should use a scalpel rather than a meat-axe.

## I

Our decision in *Village of Willowbrook* v. *Olech*, 528 U. S. 562 (2000) *(per curiam)*, applied a rule that had been an accepted part of our equal protection jurisprudence for decades: Unless state action that intentionally singles out an individual, or a class of individuals, for adverse treatment is supported by some rational justification, it violates the Fourteenth Amendment's command that no State shall "deny to any person within its jurisdiction the equal protection of the laws."

Our opinion in *Olech* emphasized that the legal issue would have been the same whether the class consisted of one or five members, because "the number of individuals in a class is immaterial for equal protection analysis." *Id.,* at 564, n. The outcome of that case was not determined by the size of the disadvantaged class, and the majority does not—indeed cannot—dispute the settled principle that the Equal Protection Clause protects persons, not groups. See *ante*, at 4–5.

Nor did the outcome in *Olech* turn on the fact that the Village was discriminating against a property owner rather than an employee. The majority does not dispute that the strictures of the Equal Protection Clause apply to the States in their role as employers as well as regulators. See *ante*, at 5. And indeed, we have made clear that "the Equal Protection and Due Process Clauses of the Four-

teenth Amendment, and other provisions of the Federal Constitution afford protection to employees who serve the government as well as to those who are served by them, and §1983 provides a cause of action for all citizens injured by an abridgment of those protections." *Collins* v. *Harker Heights,* 503 U. S. 115, 119–120 (1992).

Rather, the outcome of *Olech* was dictated solely by the absence of a rational basis for the discrimination. As we explained:

> "Our cases have recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. In so doing, we have explained that '[t]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.'
> "[Olech's] complaint also alleged that the Village's demand was 'irrational and wholly arbitrary' . . . . These allegations, quite apart from the Village's subjective motivation, are sufficient to state a claim for relief under traditional equal protection analysis." 528 U. S., at 564, 565 (some internal quotation marks and citations omitted).

Here, as in *Olech*, Engquist alleged that the State's actions were arbitrary and irrational. In response, the State offered no explanation whatsoever for its decisions; it did not claim that Engquist was a subpar worker, or even that her personality made her a poor fit in the workplace or that her colleagues simply did not enjoy working with her. In fact, the State explicitly *disclaimed* the exis-

tence of any workplace or performance-based rationale.[2]
See, *e.g.,* Reply Brief for Petitioner 17, 19. The jury pro-
ceeded to find that the respondents intentionally treated
Engquist "differently than others similarly situated with
respect to the . . . termination of her employment . . .
without any rational basis and solely for arbitrary, vindic-
tive or malicious reasons." App. to Pet. for Cert. 3–4. The
jury's verdict thus established that there was no rational
basis for either treating Engquist differently from other
employees or for the termination of her employment. The
State does not dispute this finding. Under our reasoning
in *Olech*, the absence of any justification for the discrimi-
nation sufficed to establish the constitutional violation.

The majority nonetheless concludes, based on "unique
considerations applicable when the government acts as
employer," that the "class of one" theory of equal protec-
tion is not applicable in the public employment context.
*Ante*, at 5. Its conclusion is based upon speculation about
inapt hypothetical cases, and an incorrect evaluation of
the importance of the government's interest in preserving
a regime of "at will" employment. Its reasoning is flawed
on both counts.

## II

The majority asserts that public-employment decisions
should be carved out of our equal protection jurisprudence
because employment decisions (as opposed to, for example,
zoning decisions) are inherently discretionary. I agree
that employers must be free to exercise discretionary
authority. But there is a clear distinction between an
exercise of discretion and an arbitrary decision. A discre-

---

[2] But for this disclaimer, the lower court could have dismissed the
claim if it discerned "any reasonably conceivable state of facts that
could provide a rational basis for the [State's actions]," even one not put
forth by the State. *FCC* v. *Beach Communications, Inc.*, 508 U. S. 307,
313 (1993). The disclaimer, however, negated that possibility.

tionary decision represents a choice of one among two or more rational alternatives. See 1 H. Hart & A. Sacks, The Legal Process: Basic Problems in the Making and Application of Law 162 (Tent. ed. 1958) (defining discretion as "the power to choose between two or more courses of action each of which is thought of as permissible"). The choice may be mistaken or unwise without being irrational. If the arguments favoring each alternative are closely balanced, the need to make a choice may justify using a coin toss as a tie breaker. Moreover, the Equal Protection Clause proscribes arbitrary decisions—decisions unsupported by any rational basis—not unwise ones. Accordingly, a discretionary decision with any "reasonably conceivable" rational justification will not support an equal protection claim; only a truly arbitrary one will. There is therefore no need to create an exception for the public-employment context in order to prevent these discretionary decisions from giving rise to equal protection claims.

The hypothetical situations posited by the majority do not prove otherwise. The hypothetical traffic officer described in the Court's opinion, *ante,* at 11, had a rational basis for giving a ticket to *every* speeder passing him on the highway. His inability to arrest every driver in sight provides an adequate justification for making a random choice from a group of equally guilty and equally accessible violators. As such, the Court is quite correct in stating that "allowing an equal protection claim on the ground that a ticket was given to one person and not others, even if for no discernible or articulable reason, would be incompatible with the discretion inherent in the challenged action." *Ibid.* If there were no justification for the arrest, there would be no need to invoke the Equal Protection Clause because the officer's conduct would violate the Fourth Amendment. But as noted, a random choice among rational alternatives does not violate the Equal Protection Clause.

A comparable hypothetical decision in the employment context (*e.g.,* a supervisor who is required to eliminate one position due to an involuntary reduction-in-force and who chooses to terminate one of several equally culpable employees) also differs from the instant case insofar as it assumes the existence of a rational basis for the individual decision. The fact that a supervisor might not be able to explain why he terminated one employee rather than another will not give rise to an equal protection claim so long as there was a rational basis for the termination itself and for the decision to terminate just one, rather than all, of the culpable employees.

Instead of using a scalpel to confine so-called "class of one" claims to cases involving a complete absence of any conceivable rational basis for the adverse action and the differential treatment of the plaintiff, the Court adopts an unnecessarily broad rule that tolerates arbitrary and irrational decisions in the employment context.

## III

The majority's decision also rests on the premise that "[t]he Constitution does not require repudiating th[e] familiar doctrine" of at-will employment. *Ante*, at 14. In the 1890's that doctrine applied broadly to government employment, see *McAuliffe* v. *Mayor of New Bedford*, 155 Mass. 216, 29 N. E. 517 (1892), but for many years now "'the theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected.'" *Keyishian* v. *Board of Regents of Univ. of State of N. Y.,* 385 U. S. 589, 605–606 (1967). Indeed, recent constitutional decisions and statutory enactments have all but nullified the significance of the doctrine. See, *e.g., Elrod* v. *Burns,* 427 U. S. 347 (1976); *Rutan* v. *Republican Party of Ill.,* 497 U. S. 62 (1990); see also 5 U. S. C. §2302(b)(10) (2006 ed.) (supervisor of covered federal employee may not "dis-

criminate . . . on the basis of conduct which does not adversely affect the performance of the employee or applicant or the performance of others"). Accordingly, preserving the remnants of "at-will" employment provides a feeble justification for creating a broad exception to a well-established category of constitutional protections.[3]

## IV

Presumably the concern that actually motivates today's decision is fear that governments will be forced to defend against a multitude of "class of one" claims unless the Court wields its meat-axe forthwith. Experience demonstrates, however, that these claims are brought infrequently,[4] that the vast majority of such claims are asserted in complaints advancing other claims as well, and that all but a handful are dismissed well in advance of trial. Experience also demonstrates that there are in fact rare cases in which a petty tyrant has misused governmental power. Proof that such misuse was arbitrary because unsupported by any conceivable rational basis should suffice to establish a violation of the Equal Protection Clause without requiring its victim also to prove that the tyrant was motivated by a particular variety of class-based animus. When the allegations of a complaint plainly identify "the proverbial needle in a haystack," *ante,* at 16, a federal court should not misconstrue the Constitution in order to make it even easier to dismiss unmeritori-

---

[3] Moreover, equal protection scrutiny is not incompatible with at-will employment since courts applying rational-basis scrutiny are able to rely on any *conceivable* reason for government action, and the government therefore need not explain its actual reason for terminating or disciplining the employee.

[4] Prior to the Ninth Circuit's decision this case, "class of one" claims arising in the public-employment context were permitted by every court that was presented with one. Yet there have been only approximately 150 cases—both in the district courts and the courts of appeals—addressing such claims since *Olech.*

ous claims.

         *      *      *

    In sum, there is no compelling reason to carve arbitrary public-employment decisions out of the well-established category of equal protection violations when the familiar rational review standard can sufficiently limit these claims to only wholly unjustified employment actions. Accordingly, I respectfully dissent.