*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0337p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

GERALD I. KRAFSUR, United States
Administrative Law Judge,
                        *Plaintiff-Appellant*,

      *v.*

MICHAEL DAVENPORT, individually and in
his capacity as Hearing Office Chief
Administrative Law Judge; and SOCIAL
SECURITY ADMINISTRATION,
                        *Defendants-Appellees.*

No. 13-5598

_____

Appeal from the United States District Court
for the Eastern District of Tennessee at Greeneville.
No. 2:11-cv-00170—J. Ronnie Greer, District Judge.

Argued: November 21, 2013

Decided and Filed:  December 4, 2013

Before:  SUTTON and KETHLEDGE, Circuit Judges; DOW, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Charlton R. DeVault, Jr., Kingsport, Tennessee, for Appellant.  Cecil VanDevender, UNITED STATES ATTORNEYS OFFICE, Nashville, Tennessee, for Appellees. **ON BRIEF:** Charlton R. DeVault, Jr., Kingsport, Tennessee, for Appellant. Cecil VanDevender, UNITED STATES ATTORNEYS OFFICE, Nashville, Tennessee, Mary Ann Sloan, Dennis R. Williams, John C. Stoner, Brian Seinberg, Shirley Lee Sohrn, SOCIAL SECURITY ADMINISTRATION, Atlanta, Georgia, for Appellees.

---

[*] The Honorable Robert M. Dow, Jr., United States District Judge for the Northern District of Illinois, sitting by designation.

---

**OPINION**

---

SUTTON, Circuit Judge.  Claiming that his employer violated the United States Constitution in disciplining him, a federal employee filed this lawsuit in federal district court.  In doing so, he bypassed a system set up by the Civil Service Reform Act for addressing the personnel complaints of federal employees, prompting this question:  Is the Act's personnel-grievance process exclusive?

I.

Gerald Krafsur, a federal administrative law judge, hears social security disability claims.  Among other responsibilities, he decides how much to award successful claimants in attorney's fees.  Judge Krafsur alleges that Michael Davenport, the chief judge in his office, told him that his fee awards were too low.  Krafsur's refusal to start making higher awards allegedly prompted Davenport to reprimand him, deny him leave and withhold his paychecks.  Krafsur complained about Davenport's actions to the Office of Special Counsel, an agency that handles grievances from federal employees.  Before the Special Counsel could respond, however, Krafsur went to federal district court.

Krafsur claimed in court that Davenport's actions violated the First and Fifth Amendments.  He sued Davenport under *Bivens v. Six Unknown Named Agents*, which creates a cause of action against federal officers for constitutional violations.  403 U.S. 388 (1971).  And he sued the Social Security Administration under the Administrative Procedure Act and the Tucker Act, which authorize lawsuits against the United States for (among other things) constitutional violations.  5 U.S.C. § 702; 28 U.S.C. § 1346. The district court dismissed Krafsur's lawsuit on the ground that the remedial framework established by the Civil Service Reform Act is exclusive.

II.

A.

Before Congress enacted the Civil Service Reform Act in 1978, a jumble of statutes and executive orders governed the resolution of federal employees' complaints about the workplace. The Act replaced this patchwork with a coherent system of administrative and judicial review. The new system handles all "personnel actions," a capacious term defined to include appointments, transfers, any "disciplinary or corrective action," "any . . . significant change in duties, responsibilities, or working conditions," and much else besides. 5 U.S.C. § 2302(a)(2). The extent of available review turns on the severity of the personnel action and the rank of the employee.

Generally speaking, the Act divides covered actions into two categories: adverse actions and prohibited personnel practices. *See Carducci v. Regan*, 714 F.2d 171, 175 (D.C. Cir. 1983) (Scalia, J.). Adverse actions are the most serious the government may take against its employees. For administrative law judges, these include removal, suspension, reduction in grade, reduction in pay and some furloughs. 5 U.S.C. § 7521. The Act entitles an employee facing an adverse action to a formal hearing before the Merit Systems Protection Board and if necessary an appeal to the Federal Circuit. *Id.* §§ 7521, 7703.

Prohibited personnel practices are less serious than adverse actions. The Act defines this category broadly. It includes violations of "any law, rule, or regulation implementing, or directly concerning, . . . merit system principles," *id.* § 2302(b)(12), which in turn entitle employees to "fair and equitable treatment in all aspects of personnel management," to insist upon "proper regard for . . . constitutional rights," and to prohibit "arbitrary action," *id.* § 2301(b). An employee faced with a prohibited personnel practice must first complain to the Office of Special Counsel. If the Special Counsel concludes that "there are reasonable grounds to believe that a prohibited personnel practice has occurred," he *must* report his conclusion to the agency. *Id.* § 1214(b)(2)(B). If the agency fails to take corrective action, the Special Counsel *may* refer the case to the Merit Systems Protection Board (from which the employee may

appeal to the Federal Circuit). *Id.* §§ 1214(b)(2)(C), 1214(c). But if the Special Counsel concludes that the complaint lacks merit, or if he declines to refer the case to the Board, the employee is out of luck. A court may not review the Special Counsel's decisions unless the Counsel "has declined to investigate a complaint at all." *Carson v. U.S. Office of Special Counsel*, 633 F.3d 487, 493 (6th Cir. 2011).

This description does not begin to capture the Act's many intricacies. Anyone who reads through the Act will encounter more types of covered actions and more channels of administrative or judicial review. Even within the category of prohibited personnel practices, the Act makes some exceptions. If an employee alleges discrimination because of race or sex, for example, the Act allows him to bypass the Special Counsel procedure and to sue in district court under the civil rights laws. 5 U.S.C. § 2302(d). Or if an employee alleges retaliation for whistleblowing or "for refusing to obey an order that would require [him] to violate a law," the Act allows him to bypass the Special Counsel procedure and to go straight to the Board. *Id.* §§ 1221(a), 2302(b)(9).

But this initial sketch of the Act's two main tiers suffices for now. Both parties agree that Krafsur's target, "disciplinary or corrective action," fits into the lower tier—prohibited personnel practices governed by the Act. *Id.* § 2302(a)(2). Such practices include discriminating against an employee "on the basis of conduct which does not adversely affect [his] performance." *Id.* § 2302(b)(10). As Krafsur sees it, Davenport disciplined him for making accurate fee awards, which does not "adversely affect" anybody's performance.

Krafsur at first tried to follow the trail marked by the Act for filing such complaints by sending a letter to the Office of Special Counsel. But the Special Counsel did not respond. According to the government, Krafsur's letter did not comply with the federal regulations that establish a formal procedure for lodging complaints. *See* 5 C.F.R. § 1800.1(c). All agree, however, that Krafsur retains the right to submit a formal complaint now. Instead of following that path then or now, Krafsur insists that

he has the right to file a lawsuit directly in federal district court.  May he do so?  We think not.

B.

Up first is whether Krafsur may bring a *Bivens* claim against Davenport in federal district court.  In *Bivens v. Six Unknown Named Agents*, the Supreme Court created a federal cause of action against federal officials for certain types of constitutional violations. 403 U.S. at 390.  A *Bivens* lawsuit arises against the individual officer who violated his rights, not against the government.  That explains why Krafsur directs his *Bivens* claim against Davenport rather than the Social Security Administration.

*Bivens* actions do not cover every constitutional right and do not apply in every context.  *See, e.g.*, *Wilkie v. Robbins*, 551 U.S. 537 (2007) (no *Bivens* action for violations of the Takings Clause); *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61 (2001) (no *Bivens* action against private prison operators).  If an "alternative, existing process . . . protect[s]" the right sufficiently, the courts must "refrain from providing a new and freestanding remedy." *Robbins*, 551 U.S. at 550.  "[E]ven in the absence of an alternative," moreover, the availability of a *Bivens* action remains "a subject of judgment: the federal courts must make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed . . . to any special factors counseling hesitation before authorizing a new kind of federal litigation." *Id.* (internal quotation marks omitted).

Consistent with this framework, *Bush v. Lucas* concluded that courts should not "supplement" the Civil Service Reform Act's "comprehensive procedural and substantive provisions . . . with a new judicial remedy" for personnel decisions covered by the Act.  462 U.S. 367, 368 (1983).  The Court perceived several "special factors counselling hesitation." *Id.* at 378.  It explained that giving federal employees a *Bivens* remedy risks interfering with "an elaborate remedial system that [Congress] constructed step by step, with careful attention to conflicting policy considerations." *Id.* at 388.  And it explained that a separate review track for disciplinary decisions comes with costs,

diverting the "time and energy of managerial personnel who must defend their decisions," potentially "deter[ing] [supervisors] from imposing" deserved discipline, and dampening "the efficiency of the civil service." *Id.* at 388–89.  Congress, the Supreme Court believed, "is in a far better position than a court" to balance these costs against the benefits of creating new causes of action.  *Id.* at 389.

*Bush* disposes of the *Bivens* action against Davenport.  Because the lawsuit concerns a personnel action covered by the Civil Service Reform Act, it must fail.

Krafsur insists that his grievance is different, because the Act gives him more limited remedies than it gave the employee in *Bush*.  But *Bush* does not turn on whether Congress has provided complete relief, considerable relief or little relief.  *See Schweiker v. Chilicky*, 487 U.S. 412, 425 (1988).  It turns on the special features of the federal workplace, features that make judicial interference with Congress's fine-tuned judgments inappropriate.  "In the field of federal employment," we have accordingly explained, "even if no remedy at all has been provided by the [Act], courts will [still] not create a *Bivens* remedy."  *Jones v. TVA*, 948 F.2d 258, 264 (6th Cir. 1991).

C.

The Tucker Act and Administrative Procedure Act lawsuits raise a more complex question of statutory interpretation.  The Tucker Act waives sovereign immunity in lawsuits seeking damages from the United States for various legal wrongs, including constitutional violations.  28 U.S.C. § 1346(a)(2).  And the Administrative Procedure Act waives sovereign immunity in lawsuits seeking non-monetary remedies from the United States for various legal wrongs, again including constitutional violations.  5 U.S.C. §§ 702, 706(2)(B).  Unlike Krafsur's *Bivens* claim, these lawsuits target the Social Security Administration, not Davenport.

The question here is a similar one:  Does the Civil Service Reform Act displace Krafsur's remedies under the Tucker and Administrative Procedure Acts?  As a general rule, the enactment of a new set of remedies does not by itself take away preexisting statutory remedies for the same wrong.  But a federal statute precludes resort to

alternative remedies if this result is "fairly discernible in the statutory scheme." *Elgin v. Dep't of Treasury*, 132 S. Ct. 2126, 2132 (2012); *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994).

Applying this standard, *United States v. Fausto* concluded that the Civil Service Reform Act establishes the sole track for challenging personnel decisions on statutory grounds. 484 U.S. 439, 455 (1988). The Act, to be sure, does not say in so many words that it precludes employees from invoking alternative remedies. But the Act establishes a comprehensive, reticulated and precise system of review that accounts for the rank of the employee and the severity of the personnel action. *Id.* at 448–52. The Act's history shows that the Act was designed to replace haphazard arrangements for review of personnel decisions with a unified framework. *Id.* at 444–45. These considerations gave the Court "ample" grounds for discerning exclusivity in the statutory scheme. *Id.* at 452.

Applying the same standard, *Elgin v. Department of Treasury* extended *Fausto*'s holding to constitutional claims. 132 S. Ct. at 2134. *Elgin* explained that nothing in the Act's text, structure or purpose distinguishes constitutional from statutory cases. *Id.* at 2134. As a result, it held, the arguments supporting the Act's exclusivity for statutory challenges work just as well for constitutional challenges. *Id.* at 2134–35.

*Fausto* and *Elgin* control today's case. The Civil Service Reform Act spells out in painstaking detail the path an employee must follow if he wants to challenge a prohibited personnel practice. And Krafsur concedes that a lawsuit in district court strays from this path. Because exclusivity is fairly discernible in the Act's scheme, whether with respect to constitutional or other statutory challenges to personnel decisions, Krafsur's lawsuit may not proceed. *Cf. Ryon v. O'Neill*, 894 F.2d 199, 204 (6th Cir. 1990) (reaching a parallel conclusion with respect to a statutory challenge to a prohibited personnel practice). Our earlier analysis of the *Bivens* claim reinforces this conclusion. It would be strange if the Act sent a strong enough message of exclusivity to displace a constitutionally rooted remedy but not to displace remedies created by

Congress. In both contexts, "what you get under the [Civil Service Reform Act] is what you get." *Fornaro v. James*, 416 F.3d 63, 67 (D.C. Cir. 2005) (Roberts, J.).

Krafsur responds that we have gauged the Civil Service Reform Act's exclusivity under the wrong standard. He points to a line of cases, most prominently *Webster v. Doe*, holding that a court should not interpret a statute to "deny any judicial forum for a colorable constitutional claim" unless Congress's "intent to do so [is] clear." 486 U.S. 592, 603 (1988); *see also Demore v. Kim*, 538 U.S. 510, 517 (2003); *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 681 n.12 (1986); *Johnson v. Robison*, 415 U.S. 361, 373–74 (1974). The "heightened standard" established by these decisions requires more clarity than the fair-discernability test we have just applied. *Elgin*, 132 S. Ct. at 2132.

If *Elgin* did not apply a heightened standard of clarity, why should we? Krafsur offers an answer. *Elgin* involved the most severe type of personnel decision, an adverse action. The Act thus granted the employee review before the Merit Systems Protection Board and the Federal Circuit. This guarantee of eventual judicial review made *Doe*'s special rule inapplicable. *See Elgin*, 132 S. Ct. at 2132. This case by contrast involves a less serious type of personnel decision, a prohibited personnel practice, and the Act does not give Krafsur a guaranteed path to court. The Special Counsel might stop him before he gets to the Board; and if he does not get to the Board, he cannot get to the Federal Circuit. Krafsur argues that this roadblock to judicial review, absent in *Elgin*, activates *Doe*'s special standard.

Krafsur's effort "to carve out an exception" to the Act's "exclusivity" for constitutional challenges to prohibited personnel practices, *id*. at 2134, fails for two reasons. The impediments to judicial review here are too slight to bring *Doe* into play. And even if we could bring *Doe* into play, it would not alter the outcome in the case at hand.

*Doe*'s heightened standard does not govern today's case. Each precedent in the *Doe* series involved a *total* denial of judicial review for constitutional claims. This case

involves only a narrow limit upon judicial review. Krafsur may still take his case to the Federal Circuit, so long as he gets clearance from the Office of Special Counsel.

For the most part, the claims the Special Counsel keeps out do not belong in court anyway. The Special Counsel weeds out frivolous complaints, *see* 5 U.S.C. § 1214(b)(2)(B), and frivolous arguments, even frivolous *constitutional* arguments, have no special entitlement to reach a federal judge. *See Doe*, 486 U.S. at 603 (requiring a "heightened showing" only when a statute denies a judicial forum "for a *colorable* constitutional claim" (emphasis added)). The Special Counsel also weeds out grievances that agencies stand ready to redress without litigation, *see* 5 U.S.C. § 1214(b)(2)(C), but here too the employee kept out of court can hardly complain.

Beyond that, various safeguards attending the Special Counsel procedure diminish the risk of blocking meritorious constitutional challenges. The Special Counsel has every incentive to help wronged employees. The Act makes it his *job* to expose agency misbehavior and to "protect employees . . . from prohibited personnel practices." *Id.* § 1212(a). And the Act protects his independence in performing this task. The Special Counsel receives his appointment from the President, may be removed only for cause, chooses his staff without interference from other executive agencies, and has independent authority to launch investigations, to participate in Board proceedings and to file friend-of-the-court briefs. *See id.* §§ 1211(b), 1212(b)–(d), (h).

Further still, the requirement that an employee receive the Special Counsel's go-ahead before heading to court covers only relatively minor matters. Recall that employees complaining about severe personnel decisions, like removal or demotion, may march straight to the Board and the Federal Circuit. *Id.* §§ 7521, 7703. Recall also that employees complaining about less severe personnel decisions may head straight to court if the complained-of decision involves particularly heinous types of wrongdoing like race discrimination. *Id.* § 2302(d). Recall too that employees alleging retaliation for whistleblowing or "for refusing to obey an order that would require [him] to violate a law," *id.* § 2302(b)(9)(D), may go straight to the Board and then to the Federal Circuit. This last option indeed covers many of Krafsur's claims.

We doubt whether such a modest clearance requirement, accompanied by such rigorous safeguards and applicable only to relatively minor decisions, would trigger *Doe*'s special rule in *any* context. We are confident that it does not trigger the rule in the context of government employment. The government has "greater leeway in its dealings with citizen employees than it does when it brings its sovereign power to bear on citizens at large." *Engquist v. Or. Dep't of Agriculture*, 553 U.S. 591, 599 (2008). And in general "a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency." *Id.* at 600. These principles do not mean that the government workplace is a Constitution-free zone. But they do mean that many constitutional imperatives apply with less force when the government acts as employer. *See, e.g.*, *NASA v. Nelson*, 131 S. Ct. 746 (2011) (substantive due process); *Borough of Duryea v. Guarnieri*, 131 S. Ct. 2488 (2011) (right to petition); *Engquist*, 553 U.S. 591 (equal protection); *Garcetti v. Ceballos*, 547 U.S. 410 (2006) (freedom of speech); *O'Connor v. Ortega*, 480 U.S. 709 (1987) (freedom from unreasonable searches). In the same way, the government's needs as employer do not suspend the requirement that Congress speak clearly before foreclosing all judicial review of constitutional challenges. *See Doe*, 486 U.S. at 603. But they argue against giving this requirement a broad sweep. *Doe*'s heightened standard of clarity in the last analysis does not govern this case.

Even under *Doe*'s heightened standard of clarity, Krafsur's efforts to sidestep the Act's remedial regime would still fall short. The Act leaves no doubt that an employee who believes that a prohibited personnel practice has occurred must take his complaint to the Special Counsel, not a district court, even if he contends that the practice violates the Constitution.

The text of § 2302 (which deals with prohibited personnel practices) signals that the Act's exclusivity extends to constitutional challenges. Covered prohibited practices include many actions that would offend the Constitution. *See, e.g.*, 5 U.S.C. § 2302(b)(1)(A) (discriminating on account of race, color, religion, sex or national origin); *id.* § 2302(b)(1)(E) (discriminating on account of political affiliation); *id.*

§ 2302(b)(3) (coercing an employee's political activity). The section also prohibits violating "any law, rule, or regulation implementing, or directly concerning, . . . merit system principles," *id.* § 2302(b)(12), and these principles in turn entitle employees to "proper regard for their . . . constitutional rights," *id.* § 2301(b)(2). These provisions show that Congress anticipated that the Office of Special Counsel and the Board would handle constitutional as well as statutory issues. *See Elgin*, 132 S. Ct. at 2134 ("[The Board] routinely adjudicates some constitutional claims," especially "claims that an agency [violated] an employee's First or Fourth Amendment rights."); *Bush*, 462 U.S. at 386 ("Constitutional challenges to agency action . . . are fully cognizable within [the Act's] system."). An employee may not evade this result by artful pleading—by taking a core prohibited personnel practice covered by § 2302 and dressing it up as a constitutional claim.

The text of § 2302 provides a further reason to doubt Krafsur's theory. If an employee alleges discrimination on account of forbidden grounds like race or sex, § 2302(d) permits him to sue in district court under the civil rights laws. The Act's special treatment of discrimination claims "demonstrates that Congress knew how to provide alternative forums for judicial review based on the nature of an employee's claim." *Elgin*, 132 S. Ct. at 2134. Congress's failure to include a similar exception for challenges like Krafsur's "indicates that Congress intended no such exception." *Id.* at 2135.

Allowing employees like Krafsur to jump straight to district court also would overturn a central element of the Act's architecture: the harsher the action, the greater the employee's entitlement to review. *See supra* at 3–4; *see also Kloeckner v. Solis*, 133 S. Ct. 596, 600 (2012) ("The Civil Service Reform Act . . . provides graduated procedural protections depending on an action's severity."). Under *Elgin*, employees facing more severe decisions (adverse actions) must go through the Board before bringing their constitutional challenge in court. Under Krafsur's theory, however, employees facing less severe decisions (prohibited practices) would enjoy "the luxury of immediate judicial review, without any resort to the administrative process,"

*Carducci*, 714 F.2d at 174–75.  Put concretely, an administrative law judge would have more extensive remedies for a reprimand than for a dismissal, more for a temporary reassignment than for a permanent demotion, more for a denial of leave than for a suspension.

Treating the Act's remedial scheme as non-exclusive also would subvert the Act's objectives.  One aim of the Act is to prevent "parallel litigation." *Elgin*, 132 S. Ct. at 2135.  Krafsur's theory, however, would yield parallel litigation whenever a minor personnel decision escalates into a major one—whenever, say, a supervisor follows up a reprimand with a suspension.  The employee would have to challenge the suspension (an adverse action) before the Board but could challenge the reprimand (at most a prohibited personnel practice) in district court—meaning that two different tribunals would simultaneously hear about related personnel decisions resulting from the same employee conduct and involving the same constitutional issues.  More, Krafsur's theory would yield bifurcated litigation even when no such escalation occurs.  A prohibited personnel practice might violate both a statute and the Constitution.  Krafsur's theory would require routing the statutory part of the case through the Special Counsel, the Board and the Federal Circuit, and the constitutional part through the district courts and the regional courts of appeals.

The Act serves another purpose:  ensuring that federal workplaces across the country follow a uniform body of law developed by the Federal Circuit.  *Id.*; *Fausto*, 484 U.S. at 449.  Under Krafsur's approach, however, an employee could challenge a prohibited personnel practice in the regional circuits, each of which might have its own take on the Constitution.  Worse, Krafsur's approach encourages forum shopping.  Does the law in the Federal Circuit favor the employee's constitutional argument?  Then he can follow the Special Counsel route.  Would the employee fare better in one of the regional circuits?  Then he can sue in district court.  The employee, indeed, would not even have to choose between these two options.  He could complain to the Special Counsel *and* sue in federal district court, hoping that one way or another he will win.

Far from coming up on rare occasions, these problems likely would arise frequently. Constitutional claims, especially equal protection and due process challenges, "are part of the ordinary fodder of review" in federal employment disputes. *See Elgin v. Dep't of Treasury*, 641 F.3d 6, 12 (1st Cir. 2011) (Boudin, J.).

Krafsur's interpretation of the Act would in short make a muddle of its text, a shambles of its structure and a lost cause of its purpose. That is a clear enough indication of statutory meaning to overcome any barrier set up by *Doe*.

Krafsur persists that *Doe* requires more clarity still. But unlike say *Gregory v. Ashcroft*, 501 U.S. 452 (1991) (involving restriction of a State's core sovereign powers), or *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234 (1985) (involving elimination of a State's immunity from suit), *Doe* does not establish an express-statement requirement. An early decision in the *Doe* sequence, *Johnson v. Robison*, proves the point. The Court observed that "no explicit provision [in the relevant statute] bars judicial consideration of [Robison's] constitutional claims." 415 U.S. at 367. If *Doe*'s heightened standard were an express-statement rule, the Court would have stopped there. *Cf. Dellmuth v. Muth*, 491 U.S. 223, 230 (1989) ("[Under *Atascadero*], evidence of congressional intent must be both unequivocal and textual. . . . Legislative history generally will be irrelevant to a judicial inquiry into whether Congress intended to abrogate the Eleventh Amendment."). But it did not. The Court went on to consult statutory purpose, legislative history and administrative practice before pronouncing the law insufficiently clear to prohibit constitutional review. *Robison*, 415 U.S. at 367–74.

*Demore v. Kim* does not undercut this conclusion. Kim, an alien detained pending his removal from the country, wanted to use the writ of habeas corpus to raise a constitutional challenge to his confinement. The Court held that he could do so, because the governing statute "contain[ed] no explicit provision barring [his lawsuit]." 538 U.S. at 517. The Court explained, however, that it had insisted upon a "particularly clear statement" because of the special presumption in favor of habeas review. *Id.* This case does not involve the Great Writ and thus presents no occasion for ratcheting up the *Doe* standard.

III.

For these reasons, we affirm.