Patrick GIGLIO, Plaintiff,

v.

Nancy DERMAN, Robert Kearcher, Benjamin Quinones, Jr., Robert Bongiorno and Marsha Aleksunes, Defendants.

No. 3:05CV01114(DJS).

United States District Court, D. Connecticut.

June 19, 2008.

---

**7.** In light of the court's decision, no discussion of qualified immunity is required.

John R. Williams, New Haven, CT, for Plaintiff.

Eleanor M. Mullen, Attorney General's Office, Hartford, CT, for Defendants.

### MEMORANDUM OF DECISION

DOMINIC J. SQUATRITO, District Judge.

The Plaintiff, Patrick Giglio ("the Plaintiff") brings this action against the Defendants, Nancy Derman ("Derman"), Robert Kearcher ("Kearcher"), Benjamin Quinones ("Quinones"), Robert Bongiorno

("Bongiorno"), and Marsha Aleksunes ("Aleksunes") (collectively, "the Defendants"), pursuant to 42 U.S.C. § 1983, alleging a violation of his Fourteenth Amendment right to equal protection and alleging retaliation in violation of the First Amendment right against retaliation. Now pending before the Court is the Defendants' motion for summary judgment (dkt.# 27). For the reasons that hereafter follow, the **Defendants' motion for summary judgment (dkt.# 27) is GRANTED.**

## I. LOCAL RULE 56(a) STATEMENT

Before setting forth the background facts of this case, the Court notes that the Plaintiff has failed to comply with Rule 56 of the Local Rules of Civil Procedure for the District of Connecticut ("D.Conn.L.Civ. R."). Local Rule 56(a) provides "[t]here shall be annexed to a motion for summary judgment a document entitled 'Local Rule 56(a) 1 Statement,' which sets forth in separately numbered paragraphs ... a concise statement of each material fact as to which the moving party contends there is no genuine issue to be tried." D. Conn. L. Civ. R. 56(a)(1). In addition,

[t]he papers opposing a motion for summary judgment shall include a document entitled 'Local Rule 56(a)2 Statement,' which states in separately numbered paragraphs ... corresponding to the paragraphs contained in the moving party's Local Rule 56(a)1 Statement whether each of the facts asserted by the moving party is admitted or denied.

D. Conn. L. Civ. R. 56(a)(2).

In a Local Rule 56(a) Statement, the party opposing summary judgment must also set forth, in a separate section, "Disputed Issues of Material Fact." *Id.* "All material facts set forth in [the moving party's Local Rule 56(a)] [S]tatement and supported by the evidence will be deemed admitted unless controverted by the statement required to be filed and served by the opposing party in accordance with Lo-

cal Rule 56(a) 2." D. Conn. L. Civ. R. 56(a)(1). Pursuant to Local Rule 56(a),

[E]ach statement of material fact by a movant in a local Rule 56(a)(1) Statement, or by an opponent in a Local Rule 56(a)(2) Statement, and each denial in an opponent's Local Rule 56(a)(2) Statement, must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial.

D. Conn. L. Civ. R. 56(a)(3). "[F]ailure to provide specific citations to evidence in the record as required by this Local Rule may result in the court deeming certain facts that are supported by the evidence admitted in accordance with rule 56(a)(1) . . . ." Id.

■ The Court finds that many of the Plaintiff's responses to the Defendants' Local Rule 56(a)(1) Statement are inadequate. To begin, paragraphs 68, 73, 79, 82, 90, 91, 99, 129, and 136 of the Plaintiff's Local Rule 56(a)(2) Statement consist of refusals to respond, or responses that neither deny nor admit the fact asserted. The Local Rule specifically demands each of the facts asserted be either admitted or denied. D. Conn. L. Civ. R. 56(a)(2). Moreover, these paragraphs fail to cite to affidavits or evidence. *See* D. Conn. L. Civ. R. 56(a)(3). Therefore, the Court deems admitted paragraphs 68, 73, 79, 82, 90, 91, 99, 129, and 136.

■ Concurrently, paragraphs 108 and 109 in the Plaintiff's Local Rule 56(a)(2) Statement contain no citations to evidence in the record. The lack of citation alone allows the Court to deem such paragraphs admitted.

Paragraphs 100 through 107 of the Defendants' Local Rule 56(a)(1) Statement each describe an undisputed factual interaction between Aleksunes and the Labor

Relations Director. Next, paragraphs 108 and 109 of the Defendants' Local Rule 56(a)(1) Statement describe reasoning of the Labor Relations Director, the Agency Personal Administrator, and the Chief Operating Officer in "the final decision on termination." (Dkt.# 27, Pt. 2, ¶¶ 108–09.) In response, the Plaintiff denied paragraphs 108 and 109 because "it is obvious from the foregoing that defendant Aleksunes was an active and crucial participant in this decision-making process." *See* (Dkt.# 28, Pt. 1, ¶ 108.)

■ The purpose of the Local Rule 56(a) Statement is to help the Court determine the facts of a case, whereas the parties' legal arguments are properly submitted in the memorandum of law. It is therefore inappropriate to deny true and accurate statements of fact simply because the Plaintiff disagrees with the form presented. In other words, it is a fact that the Labor Relations Director, the Agency Personal Administrator, and the Chief Operating Officer made the final determination of termination as required by the terms of their employment. To dispute this fact based on the question of Aleksunes involvement is not an appropriate denial. This is especially true when considering the Defendants already have admitted in the preceding paragraphs that such involvement existed. Therefore, the Court deems paragraphs 108 and 109 admitted.

■ Finally, the Plaintiff attempts to make motions to strike in paragraphs 57, 105, 115, and 116 of the Plaintiff's Local Rule 56(a)(2) Statement. It is inappropriate for a party to make motions or legal arguments in a Local Rule 56(a) Statement. Such motions and legal arguments are to be submitted in a memorandum of law. *See* D. Conn. L. Civ. R. 56. Therefore, the Court deems paragraphs 57, 105, 115, and 116 admitted within the bounds of Local Rule 56(a).

In light of the previous discussion the following undisputed material facts are present in this action.

## II. FACTS

In 1998, the State of Connecticut Department of Mental Health and Addiction Services ("DMHAS") employed the Plaintiff in the position of police officer; first at the Whiting Forensic Institute ("Whiting") and later at the Greater Bridgeport Community Mental Health Center ("GBCMHC"), which is a part of the Southwest Connecticut Mental Health System ("SWCMHS"). DMHAS operated both Whiting and GBCMHC, each of which had its own Public Safety Unit that was part of the DMHAS Public Safety Division. Police Officers employed by DMHAS act as "special policemen" pursuant to Connecticut General Statute § 29–18. All DMHAS police officers are required to proceed in a manner that is consistent with the SWCMHS use of force policy, which includes the Commissioner's policy on OC spray, the SWCMHS Safety Manual and other policies and procedures. Each DMHAS facility has its own policy on the use of force and these are modified to the Commissioner's policy surrounding the use of OC spray on patients and non-patients. Every police officer assigned to SWCMHS is expected to be familiar with the SWCMHS Safety Manual and the Plaintiff testified that he had read the manual. The Commissioners Policy prohibits verbal abuse, physical abuse, or any other abusive conduct towards clients and requires a thorough investigation of all reported suspicions of client abuse.

Here, the governing DMHAS policy sets different levels of force DMHAS police officers may use. The use of force policy begins with the lowest level of force and progresses up the continuum of force, from command presence, to verbal command, to

open hand control, to Oleoresin Capsicum ("OC") spray and to the use of a baton. Additionally, the Division of Public Safety requires the reporting of alleged violations of DMHAS policies, procedures, regulations or work rules through the chain of command. On the date of the incident described below, Quinones held the lowest position of Acting Lieutenant of the GBCMHC Public Safety Unit. Bongiorno held the next highest position of Captain of the Public Safety Division. Aleksunes held the next highest position of Chief of the Division of Safety Services. Paul DiLeo ("DiLeo") held the highest position of DMHAS Chief Operating Officer, and James Pisciotta ("Pisciotta") held the highest position of SWCMHS Chief Executive Officer.

Between 2004 and 2005, Bongiorno, Derman, the Human Resources Officer, and Lieutenant Margaret Miner interviewed the Plaintiff and five other candidates for a promotion to the position of police sergeant at GBCMHC. The Plaintiff was promoted to the temporary sergeant position and at all relevant times herein was serving a working test period at SWCMHS. Corresponding to his transfer to SWCMHS, the Plaintiff attended an August 6, 2004 agency-wide orientation that provided him with several DMHAS Policies and procedures including the DMHAS Mission Statement, the DMHAS Work Rules/Reporting of Alleged Work Rule Violation, and the Commissioner's Policy Statement No. 29 on Client Abuse.

On September 24, 2004, Bongiorno sent an email to the lieutenants in charge of the DMHAS public safety units regarding the issue of OC spray. The email stated that "the rules of engagement remain the same: OC Spray should only be used on a client when the Officer feels that the situation is so dangerous, that imminent serious physical injury or death would result if OC was not employed." (Dkt.# 27, Pt. 3, Ex. E.)

Bongiorno states that this email was consistent with the Commissioner's policy, Section C, Subsection 3(C) on OC spray and that it directed the lieutenants to post the email so that all officers and sergeants could read it.

On March 14, 2005, an admissions staff member, Jo–Ann Sumple ("Sumple"), called for police assistance at the Admissions Unit because a patient ("Patient") was trying to leave. The Patient had signed a voluntary seventy-two (72) hour hold and was waiting to be seen by a psychiatrist to assess his clinical condition. The Patient indicated that he wanted to leave because he would not be receiving medication based on his negative drug opiate test. The Plaintiff arrived at the Admissions Unit and discovered the Patient crouched on the floor, waiting for the locked door to be open. The Plaintiff noticed that the Patient was a twenty-five (25) year old male and that there were three exits, counting the stairway. The Plaintiff asked the Patient to leave the door area and follow him to a television room. The Patient responded, "[g]o fuck yourself" and that he "would do what it takes to leave." (Dkt.# 27, Pt. 3, Ex. H–2.) The Plaintiff got the feeling that the Patients had "the look" in his eyes like he wanted to bolt. (Dkt.# 27, Pt. 3, Ex. G–2.) "[W]hen you've seen [the look], you know what it is." (*Id.*)

Around this time Officer Arrojado ("Arrojado") arrived on the scene and took position about ten (10) to fifteen (15) feet from the Plaintiff's right side. The Plaintiff and Arrojado offered to help the Patient into the waiting area and when they reached out to help him up the Patient responded, "if anyone touches me, I will fuck them up." (Dkt.# 27, Pt. 3, Ex. H–2.) As the Patient said this, he threw his arms out at the officers. (*Id.*) The Plaintiff and Arrojado repeated their offer to help the

Patient into the waiting room numerous times. At this time a staff member, Tracey Smith ("Smith"), attempted to gain access to the Admissions Unit through the South exit. Sumple and Arrojado motioned to Smith not to enter through the exit so, as Arrojado wrote in his statement, "[the Patient] wouldn't escape and potentially harm himself or others occupying the lobby area." (*Id.*)

Next, the Plaintiff attempted to take the Patient's arm and the Patient tensed up and pulled his arm away from the Plaintiff. (Dkt.# 27, Pt. 3, Ex. I–2.) The Patient stated that he was "leaving this fucking place. Don't touch me." (*Id.*) At or around this time one of the nurses asked the Plaintiff if he wanted a Code 90 to be called.[1] The Plaintiff told the Patient that he would not fight him, but if he did not comply he would be pepper sprayed. The Plaintiff felt that "[the Patient's] body language, even though he was in a crouched position, was threatening; [the Plaintiff] felt that he would come at him. He felt that if he touched him again, he would go off ... and that anyone in the area could get hurt." (Dkt.# 27, Pt. 3, Ex. G–2.) The Patient then responded, "Go fuck yourself, you're not a real cop." (*Id.*) Once again, the Plaintiff told the Patient to leave the door area and restated he would use OC spray, whereupon the Patient responded, "Go ahead, use the spray." (*Id.*) The Plaintiff, considering that the Patient (1) had stated his intention to attack, (2) exchanged a large amount of verbal assaults, (3) was in street clothes, and (4) had a bag beside him with unknown contents, deployed the OC spray. (*Id.*)

A video camera installed on the walls of GBCMHC recorded the incident in three second intervals. The videotape of the incident showed approximately six (6) minutes elapsed between the arrival of the Plaintiff on the Admissions Unit and his use of the OC spray on the Patient, and approximately thirteen (13) minutes elapsed between the arrival of the Plaintiff on the Admissions Unit, and the arrival of the doctor to assess the Patient.

On March 16, 2005, the Plaintiff completed a case report and a use of force report. Quinones reviewed the reports and noted that the OC spray was used on a mentally-ill patient in a controlled hospital environment with access to clinical interventions that utilized Behavioral Management Strategies ("BMS"), as required by the Commissioner's policy. (Dkt.# 27, Pt. 2, ¶ 68.) Pursuant to the chain of command, Quinones forwarded the reports to Bongiorno who agreed with Quinones. Bongiorno forwarded the reports to Aleksunes who concurred with the finding that the Plaintiff inappropriately used the OC spray. Aleksunes directed Bongiorno to have Quinones complete a MHAS–20 form, a reporting mechanism for alleged violations of DMHAS policies and procedures. Aleksunes forwarded the reports and the MHAS–20 to Raymond Cioffi ("Cioffi"), DMHAS Labor Relations Director, and Fred Ferris ("Ferris"), Agency Human Resources Administrator. Aleksunes also verbally notified the DiLeo.

Around the same time that Quinones forwarded the reports to Bongiorno, Quinones also notified Kearcher of the incident. Kearcher, acting as the Temporary Human Resources Director, made initial recommendations to Cioffi that the Plaintiff be placed on desk duty pending the administrative investigation. Instead, Cioffi put the Plaintiff on administrative

---

1. Pursuant to the SWCMHS Safety Manual, a Code 90 may be called during or prior to a difficult or potentially dangerous or assaultive situation. (Dkt.# 27, Pt. 3, Ex. C–7). When a Code 90 is called all available staff are required to report to the Clinical Leader and be prepared to render such assistance as is necessary. (*Id.*)

leave with pay. At this point, Kearcher recused himself from conducting the investigation. As such, Ferris reassigned the administrative investigation to Gary Siegal ("Siegal"), who was then acting as the Temporary Human Resources Director.

Siegal conducted the administrative investigation according to Human Resources policies and procedures. The investigation reviewed statements from the Plaintiff, Arrojado, the nurse attending the patient, Sumple and Smith. The investigation also involved Siegal watching the video tape of the incident. Given the investigation, Siegal concluded that: (1) the Plaintiff did not follow the DMHAS Commissioner's policy on using OC spray as required by Subsection 3(C); (2) the admissions nurse request that the Patient move away from the door did not amount to a clinical intervention; and (3) the swearing of the patient and pulling away of his arm did not amount to the patient being out of control given that the doors were locked. (Dkt.# 27, Pt. 3, Ex. H, ¶ 13.) Based on these findings "[Siegal] made a recommendation in discipline for [the Plaintiff] as failure of working test period as a police sergeant at a minimum with any decision on termination to be made after weighing his length of service together with any other incidents that may have occurred during his fifteen (15) years of service." (*Id.* at ¶ 14.)

On April 25, 2005, Derman, in her position as Human Resources Officer, conducted a *Loudermill* Hearing.[2] The purpose of the *Loudermill* Hearing was to afford the Plaintiff an opportunity to present reasons why disciplinary action should not be taken against him given the conclusions of the administrative investigation. Those present at the *Loudermill* Hearing included the Plaintiff, his union representative, Quinones, and Derman who allowed Quinones to be present at the *Loudermill*

Hearing as management's representative. The Plaintiff contested the appropriateness of Quinones' presence at the hearing and Derman's abilities to conduct the hearing. Derman permitted Quinones' to attend in order to clarify any issues raised by the Plaintiff. Derman also explained to the Plaintiff that she was conducting the hearing to assure objectivity. During the hearing the Plaintiff stated that his use of the OC spray was appropriate under the Bridgeport use of force policy and that he did not use poor judgment because he did as he was trained. (Dkt.# 27, Pt. 2, ¶¶ 97–98.)

Final recommendations regarding discipline of DMHAS officers are made by Cioffi, based on an interactive process with facility management. Cioffi was advised by Aleksunes that the Plaintiff's deployment of OC spray did not meet Section C, Subsection 3(C), of the Commissioner's policy on OC spray because the Patient did not exhibit threatening behavior. (Dkt.# 27, Pt. 3, Ex. L, ¶¶ 7, 9–10.) This advice was based on reviewing the video, the use of force report and incident report prepared by the Plaintiff, as well as the statements of Arrojado, Sumple, Smith, and other witnesses. Cioffi also had Aleksunes review the records of OC spray use by DMHAS officers since the date when OC record keeping began in 2000. Aleksunes found that of the 23 uses of OC spray reported since 2000, all were justified under the Commissioner's policy on OC spray. (*Id.* at ¶ 12.) Finally, Cioffi also consulted Aleksunes as to the nature of discipline to impose on the Plaintiff:

she initially recommended a significant suspension but changed her recommendation to termination in light of again reviewing the video combined with [the Plaintiff's] failure at the *Loudermill* to

**2.** This term is derived from the Supreme Court case *Cleveland Bd. of Educ. v. Louder-* *mill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985)

acknowledge that his use of OC was not appropriate which prevented any consideration of retaining him as an option on the Commissioner's policy of the use of OC spray and BMS techniques to prevent the likelihood of repetition of the same improper use of OC spray.

(*Id.* at ¶ 13.)

The final decision to terminate the Plaintiff was made by Cioffi, Ferris and DiLeo. In rendering his decision, Cioffi relied on Siegal's investigative report, the video, the Plaintiff's *Loudermill* Statements, and his consultation with Aleksunes. Cioffi determined that the Plaintiff should be terminated because of: (1) the Plaintiff's egregious conduct in relation to the Commissioner's policy on OC spray; (2) Aleksunes' review of other uses of OC spray since 2000 combined with the Plaintiff's failure to acknowledge his failure to adhere to the policy on OC spray and BMS techniques that would prevent another instance of improper deployment; (3) the Plaintiff's violation of the Commissioner's policy statement on patient/client abuse when he was unprovoked; and (4) the inability of the Plaintiff's years of state service in overcoming the egregious conduct. (*Id.* at ¶¶ 14–15.) On May 26, 2005, DMHAS terminated the Plaintiff's employment and the Plaintiff initiated this action.

## III. DISCUSSION

On July 11, 2005, the Plaintiff filed this two count action. Count one alleges the Defendants' acted intentionally, irrationally and maliciously in initiating and conducting the disparate disciplinary action, which violated the Plaintiff's Fourteenth Amendment right to equal protection. Count two alleges that the Defendants' disciplinary action was a violation of the Plaintiff's First Amendment right because he was terminated in retaliation for a prior lawsuit that he filed and won against a former DMHAS employee.

On July 19, 2006 the Defendants filed a motion for summary judgment on the grounds that the evidence submitted shows no genuine issue of material fact in dispute, and the Plaintiff cannot sustain his burden of proof. The Plaintiff objected to the motion for summary judgment on August 10, 2006, claiming he made out a sufficient case for the irrational application of disparate treatment.

### A. Summary Judgment

A motion for summary judgment may be granted, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56. Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" *Am. Int'l Group, Inc. v. London Am. Int'l Corp.,* 664 F.2d 348, 351 (2d Cir.1981).

A dispute concerning a material fact is genuine "'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir.1992) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A court must view all inferences and ambiguities in a light most favorable to the nonmoving party. *See Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Id.*

### B. Collateral Estoppel and Arbitration Awards

█ Subsequent to the initiation of this action, a state arbitrator ("Arbitrator") at the Connecticut Office of Labor Relations issued a November 13, 2006, ruling regarding the Plaintiff's employment at DMHAS. The Arbitrator determined that there was no just cause for terminating the Plaintiff and that he should be reinstated to his position with full back pay and benefits.

The Plaintiff, in his Sur–Reply Brief in Opposition to the Motion for Summary Judgment, argues that the Court is bound by the factual findings of the Arbitrator. In support of this contention the Plaintiff cites to *University of Tennessee v. Elliott*, 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986), *United States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966), *Long Island Lighting Co. v. IMO Indus.*, 6 F.3d 876, 885–86 (2d Cir.1993) and *Doe v. Pfrommer*, 148 F.3d 73, 79 (2d Cir.1998). The Plaintiff argues that based on this case law, collateral estoppel precludes a party to a state administrative proceeding from contesting unappealed factual findings in a subsequent federal civil action that involves the same issues. (Dkt.# 42, p. 1.) The Defendants, in their Reply to Plaintiff's Sur-Reply In Opposition to the Motion for Summary Judgment, argue that the cases cited by the Plaintiff are inappropriate because they pertain to decisions by state administrative agencies, whereas the case at bar concerns arbitration decisions, which are governed by *McDonald v. City of West Branch*, 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984). The Court agrees with the Defendants.

The Court begins by noting that the full faith and credit statute, 28 U.S.C. § 1738, requires that state court judgments be given the same preclusive effect in the federal courts which they would receive in the state court from where they originat-ed. In § 1983 actions, it is well settled that state court judgments are to be given issue preclusive effect. *See Allen v. McCurry*, 449 U.S. 90, 104, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). Section 1738 does not, however, contain any provision that gives preclusive effect to the decisions of state administrative agencies.

In *Elliott*, the Supreme Court sought to determine this issue, i.e. whether issue preclusion is applicable to unreviewed state agency determinations in § 1983 civil rights actions. *Elliott*, 478 U.S. at 788, 106 S.Ct. 3220. The plaintiff in *Elliott*, an employee of the University Agricultural Extension Service, filed suit alleging wrongful termination based on race, in violation of various civil rights statutes, including Title VII and § 1983. Id. at 790–91, 106 S.Ct. 3220. While the plaintiff's suit was pending, his claims were raised at a hearing before an administrative assistant presiding as an administrative law judge ("ALJ"). *Id.* at 791, 106 S.Ct. 3220. The plaintiff presented evidence of racially discriminatory animus and the ALJ held that he lacked jurisdiction but heard evidence and concluded that the charges made against plaintiff were not racially motivated. *Id.* The plaintiff filed an action in district court where summary judgment was entered on the basis of preclusion. Id. at 792, 106 S.Ct. 3220. The Sixth Circuit reversed the district court and the Supreme Court reversed in part and affirmed in part holding that "when a state agency acting in a judicial capacity ... resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate ..., federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts." *Id.* at 799, 106 S.Ct. 3220 (quoting *Utah Constr. & Mining Co.*, 384 U.S. at 422, 86 S.Ct. 1545) (internal citations omitted).

In *McDonald*, the Supreme Court considered a public employee's § 1983 claim alleging First Amendment retaliation and held that a federal court should not accord preclusive effect to an award in an *arbitration proceeding* brought pursuant to the terms of a collective-bargaining agreement. *McDonald*, 466 U.S. at 284, 104 S.Ct. 1799 (emphasis added). In making this determination the Supreme Court noted that because § 1738 applies only to "judicial proceedings," arbitration awards do not fall within the purview of the statute. *Id.* at 288, 104 S.Ct. 1799. The Court noted that "although arbitration is well suited to resolving contractual disputes, ... it cannot provide an adequate substitute for a judicial proceeding in protecting the federal statutory and constitutional rights that § 1983 is designed to safeguard." *Id.* at 290, 104 S.Ct. 1799. The policies behind such reasoning were (1) an arbitrator may not have "the expertise required to resolve the complex legal questions that arise in § 1983 actions;" (2) "an arbitrator's authority derives solely from the contract ... [and therefore] an arbitrator may not have the authority to enforce § 1983"; (3) the interests of the union, which "has exclusive control over the manner and extent to which ... [a] grievance is presented," are not always "identical or even compatible" with those of an individual employee; and (4) "arbitral factfinding is generally not equivalent to judicial factfinding." *Id.* at 290–91, 104 S.Ct. 1799.

In the instant case, this Court is guided by the same concerns as the Supreme Court in *McDonald*. The Plaintiff's claims are that the Defendants' actions have violated § 1983. Accordingly, just as the Plaintiff in *McDonald* did not suffer the preclusive effect of an arbitrator's factfinding in a § 1983 case, so too should the Defendant in this case be afforded the judicial expertise of the district court. Therefore, the Court denies the Plaintiff's

invitations to impose the doctrine of collateral estoppel and to adopt the facts found by the Arbitration Award.

C. Equal Protection "Class of One"

 In their motion for summary judgment, the Defendants argue that the Plaintiff's class of one action must fail because he has failed to show that he was treated differently from other similarly situated employees. The Defendants argue that the Plaintiff failed to show *prima facie* identical similarity between previous incidents and that he cannot show "different treatment ... for any reason other than a legitimate government policy ... [or that] the difference in treatment ... [was not] on the basis of mistake." (Dkt.# 27.) The Plaintiff simply contends that he "has made out a sufficient case of the irrational application of disparate treatment." (Dkt.# 28, p. 3.)

Whereas the Supreme Court recognizes class of one equal protection challenges to state legislative and regulatory actions, this theory does not apply in the public employment context. *Engquist v. Oregon Dept. of Agriculture*, — U.S. ——, 128 S.Ct. 2146, 2157–58, 170 L.Ed.2d 975 (2008). Here, it is undisputed that the Plaintiff's class of one claim arises from his discipline while employed by DMHAS, a state mental health facility. **Accordingly, the Defendants' motion for summary judgment (dkt.# 27) as to Count One is GRANTED.**

D. First Amendment Retaliation

 The Plaintiff alleges that the Defendants are liable for violating the First Amendment right against retaliation because his termination was due to the Defendants retaliating for the Plaintiff's successful lawsuit against Edward Connole, a former employee of DMHAS. (Dkt.# 1, ¶ 12.) The Defendants argue that summary judgment should be entered to this claim because there is no causal connection

between the Plaintiff's speech and his termination. (Dkt.# 27, p. 24.) Although the Plaintiff responded to relevant facts in his Local Rule 56(a)(2) Statement, he failed to present any legal argument to support his First Amendment claim. "Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." *Ludwiczak v. Hitachi Capital Am. Corp.*, 528 F.Supp.2d 48, 59 (D.Conn. 2007). Because the Plaintiff did not address the First Amendment claim in either of his opposition memoranda, the Court deems this claim abandoned.

▮▮▮ Even if it were not abandoned, the Plaintiff's First Amendment claim fails as a matter of law. The Supreme Court has recognized "a public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment." *Connick v. Myers*, 461 U.S. 138, 140, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). The plaintiff must then show "(1) his speech addressed a matter of public concern, (2) he suffered an adverse employment action, and (3) a causal connection existed between the speech and the adverse employment action, so that it can be said that his speech was a motivating factor in the determination." *Mandell v. County of Suffolk*, 316 F.3d 368, 382 (2d Cir.2003) (internal quotation marks omitted). Additionally, the Supreme Court requires courts to balance "the interests of the [employee], as a citizen, [in exercising their rights] . . . and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Morris v. Lindau*, 196 F.3d 102, 109–10 (2d Cir.1999) (citing *Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)).

▮▮▮ Typically, summary judgment is "precluded where questions regarding an employer's motive predominate in the inquiry regarding how important a role the protected speech played in the adverse employment decision." *Morris*, 196 F.3d at 110. Nevertheless, a defendant can still succeed on a motion for summary judgment if it can demonstrate "that it would have taken the same adverse action even in the absence of the protected conduct." *Cotarelo v. Village of Sleepy Hollow Police Dept.*, 460 F.3d 247, 252 (2d Cir.2006) (internal quotation marks omitted); *see Scott v. Coughlin*, 344 F.3d 282, 287–88 (2d Cir. 2003) ("Regardless of the presence of retaliatory motive . . . a defendant may be entitled to summary judgment if he can show dual motivations, i.e., that even without the improper motivation the alleged retaliator action would have occurred.").

Finally, the non-moving party "may not rely simply on conclusory allegations or speculation to avoid summary judgment." *Id.* Thus, once the plaintiff establishes a prima facie case, the burden of production shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for its action. If they do so, the burden then shifts back to the plaintiff to demonstrate that the proffered reason was . . . a pretext. The ultimate burden of persuasion . . . remains with the plaintiff." *Sumner v. U.S. Postal Service*, 899 F.2d 203, 209 (1990) (internal citations omitted; internal quotations omitted).

▮▮▮ The Defendants do not refute that the Plaintiff's previous lawsuit amounted to protected speech or that he suffered an adverse employment action in his termination. Instead, the Defendants argue that the Plaintiff lacks any causal connection between his speech and the adverse employment determination against him. The causal connection must be "sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action, that is to say, the adverse employ-

ment action would not have been taken absent the employee's protected speech." *Morris*, 196 F.3d at 110 (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). A plaintiff can establish a causal connection through direct evidence of retaliatory animus or through indirect evidence that "the protected activity was closely followed in time by the adverse action." *Reed v. A. W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir.1996) (internal quotation marks omitted).

Here, the causal connection is temporally too attenuated. No reasonable jury could consider the five years between the conclusion of the previous litigation and the investigation in question to be sufficient to warrant an inference that the protected speech was a substantial motivating factor. *See, e.g., Morris*, 196 F.3d at 102 (finding that an inference of causation was suggested by the two-year period between the protected speech and the adverse employment action); *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45–6 (2d Cir.1980) (finding that an inference of causation is established when there is an eight month gap between the protected speech and the adverse action); *Bernhardt v. Interbank of N.Y.*, 18 F.Supp.2d 218, 226 (E.D.N.Y. 1998) (determining that eleven months is close enough to establish an inference of a causal connection to plaintiff's termination).

Even assuming such indirect inference did exist, the only party potentially liable for retaliation is Kearcher, who recused himself from the investigation. Thus, the Plaintiff's first amendment retaliation claim fails for lack of a causal connection between the adverse employment action and the exercise of protected speech. **Consequently, with regard to the Plaintiff's first amendment retaliation claim, the Defendants' motion for summary judgment (dkt.# 27) is GRANTED.**

### E. Qualified Immunity

The Defendants argue that they are entitled to qualified immunity because they did not violate any constitutional right of the Plaintiff. (Dkt.# 27, Pt. 1, p. 29.) Even assuming that they did violate a constitutional right, the Defendants argue that they could not reasonably have believed that they were violating the Plaintiff's rights. (*Id.* at p. 30.) The Plaintiff fails to respond to the Defendants' argument. As summary judgment has been granted on each of the counts in this action, the Court need not determine whether qualified immunity applies in this context.

### IV. CONCLUSION

**For the foregoing reasons the Defendants' motion for summary judgment (dkt.# 27) is GRANTED. Judgment in favor of Nancy Derman, Robert Kearcher, Benjamin Quinones, Jr., Robert Bongiorno and Marsha Aleksunes on each count of the complaint. The Clerk of the Court shall close this file.**

**IT IS SO ORDERED.**