No. 111,598

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JASON D. KELSEY,
*Appellant*.

SYLLABUS BY THE COURT

1.

Appellate courts presume statutes are constitutional and must resolve all doubts in favor of a statute's validity. Courts must interpret a statute in a way that makes the statute in question constitutional if there is any reasonable construction that would maintain the legislature's apparent intent.

2.

The Fourteenth Amendment to the United States Constitution provides that no state shall deny to any person within its jurisdiction the equal protection of the laws. The Equal Protection Clause of the Fourteenth Amendment requires that states treat similarly situated individuals similarly.

3.

Kansas courts evaluate equal protection challenges using a three-step process. First, the court considers whether the legislation creates a classification resulting in different treatment of similarly situated individuals. Second, if the statute does treat arguably indistinguishable individuals differently, then the court examines the nature of

1

the classification or right at issue to determine the appropriate level of scrutiny. Finally, the court applies the proper level of scrutiny to the statute.

4.

Because K.S.A. 21-2512, a statute permitting postconviction DNA testing for some offenders, does not burden a fundamental right or involve a suspect class, we analyze any equal protection question concerning the statute by using a rational basis test.

5.

By its own terms, K.S.A. 21-2512 permits only offenders convicted of premeditated first-degree murder or rape to receive postconviction DNA testing of biological materials.

6.

When a district court imposes a hard 25 life sentence, which is the mandatory off-grid sentence for a Jessica's Law conviction of aggravated indecent liberties in violation of K.S.A. 21-3504(a)(3)(A), the offender who is 18 years of age or older receives an identical sentence to an offender convicted of rape under K.S.A. 21-3502(a)(2) or to one convicted of aggravated criminal sodomy under K.S.A. 21-3506(a)(1) or (a)(2). Thus, the narrow class of offenders sentenced under Jessica's Law serving hard 25 life sentences for aggravated indecent liberties with a child under the age of 14 are similarly situated to offenders sentenced for rape or aggravated criminal sodomy.

Appeal from Labette District Court; ROBERT J. FLEMING, judge. Opinion filed August 21, 2015. Reversed and remanded with directions.

*Janine Cox*, of Kansas Appellate Defender Office, for appellant.

*Natalie Chalmers*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before LEBEN, P.J., HILL and ATCHESON, JJ.

HILL, J.:  Jason Kelsey argues that the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution mandates that people in the State's custody that are similarly situated must be similarly treated unless there are good reasons to treat them differently. Kelsey, sentenced under Jessica's Law, is serving two concurrent mandatory life sentences for two counts of aggravated indecent liberties with a child under the age of 14, both off-grid sex crimes. He now contends that the law which permits postconviction DNA testing, K.S.A. 21-2512, violates the Equal Protection Clause because it permits testing for those serving sentences for rape or aggravated criminal sodomy, also off-grid sex crimes, but not to offenders convicted of his crimes. He asks us to reverse the district court's summary dismissal of his motion asking for DNA testing.

Because the law mandates identical sentences for someone who is 18 or older and convicted of aggravated indecent liberties with a child under the age of 14 with those offenders sentenced for rape or aggravated criminal sodomy, we hold that K.S.A. 21-2512 does violate the Equal Protection Clause. The two classes of offenders are similarly situated, and there is no rational basis for treating them differently. We reverse the district court's summary dismissal of Kelsey's motion and remand to the district court to make findings on whether the three threshold requirements of K.S.A 21-2512(a) are met here, requiring DNA testing.

*Kelsey pled guilty.*

Kelsey pled guilty to two counts of aggravated indecent liberties with a child in violation of K.S.A. 21-3504(a)(3)(A). The court sentenced him under Jessica's Law, K.S.A. 21-4643(a)(1)(C), to concurrent mandatory hard 25 life sentences with no

3

possibility of parole for 25 years and also ordered lifetime postrelease supervision. He is now serving his sentences.

Kelsey moved for postconviction DNA testing under K.S.A. 21-2512. The court summarily denied his motion for a lack of standing. Simply put, since Kelsey stood convicted of neither murder nor rape, in the court's view, he was not entitled to testing.

Kelsey appeals this ruling by challenging the constitutionality of Kansas' postconviction DNA testing scheme. Specifically, he argues K.S.A. 21-2512 violates the Fourteenth Amendment's Equal Protection Clause because the statute treats similarly situated offenders differently without any justification for such treatment.

We note that Kelsey did not raise his constitutional argument in his pro se motion in the district court, but it appears for the first time here in his brief to this court. Generally, constitutional grounds for reversal asserted for the first time on appeal are not properly before this court for review. *State v. Coman*, 294 Kan. 84, 89, 273 P.3d 701 (2012). However, we address it now under an exception set forth in *State v. Anderson*, 294 Kan. 450, 464-65, 276 P.3d 200 (2012)—specifically, Kelsey's newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case. See *State v. Denney*, 278 Kan. 643, 651, 101 P.3d 1257 (2004). In *Denney*, the court addressed the constitutionality of K.S.A. 21-2512 for the first time on appeal. We follow the Supreme Court's lead in *Denney*.

*Our standard of review and guiding principles.*

Appellate courts presume statutes are constitutional and must resolve all doubts in favor of a statute's validity. And we must interpret a statute in a way that makes it constitutional if there is any reasonable construction that would maintain the legislature's apparent intent. *State v. Seward*, 296 Kan. 979, 981, 297 P.3d 272 (2013).

4

The Fourteenth Amendment to the United States Constitution provides "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." The Equal Protection Clause of the Fourteenth Amendment "requires that states treat similarly situated individuals similarly." *State v. Cheeks*, 298 Kan. 1, Syl. ¶ 3, 310 P.3d 346 (2013). Kansas courts evaluate equal protection challenges using a three-step process:

> "*First*, the court considers whether the legislation creates a classification resulting in different treatment of similarly situated individuals. *Second*, if the statute does treat 'arguably indistinguishable' individuals differently, then the court examines the nature of the classification or right at issue to determine the appropriate level of scrutiny. *Finally*, the court applies the proper level of scrutiny to the statute." (Emphasis added.) *Cheeks*, 298 Kan. 1, Syl. ¶ 2.

The level of such scrutiny is based on the rights involved. There are three levels—strict scrutiny, intermediate scrutiny, and the differential scrutiny of the rational basis test. *State v. Salas*, 289 Kan. 245, Syl. ¶ 3, 210 P.3d 635 (2009). The Supreme Court has previously determined that because K.S.A. 21-2512 does not burden a fundamental right or involve a suspect class, it would analyze the equal protection question using a rational basis test. *Cheeks*, 298 Kan. at 8; *Denney*, 278 Kan. at 654. We will as well.

Kelsey, as the party challenging the law's constitutionality, has the burden to prove he is similarly situated to other members of a class receiving different treatment, and in conducting our review, we are limited by the distinctions Kelsey argues. See *Salas*, 289 Kan. at 249. The *Salas* court held that "the parameters of a court's consideration of whether individuals are similarly situated [are] set by the distinctions argued by the complaining party."

5

*The statute in question is limited.*

By its own terms, K.S.A. 21-2512 permits only offenders convicted of premeditated first-degree murder or rape to receive postconviction DNA testing of biological materials. The statute permits DNA testing if three conditions are met:

> "(a) Notwithstanding any other provision of law, a person in state custody, at any time after conviction for murder as defined by K.S.A. 21-3401, and amendments thereto, or for rape as defined by K.S.A. 21-3502, and amendments thereto, may petition the court that entered the judgment for forensic DNA testing (deoxyribonucleic acid testing) of any biological material that:
>> "(1) Is related to the investigation or prosecution that resulted in conviction;
>> "(2) is in the actual or constructive possession of the state; and
>> "(3) was not previously subjected to DNA testing, or can be subjected to retesting
> with new DNA techniques that provide a reasonable likelihood of more accurate and probative results." K.S.A. 21-2512.

We do not know if the three conditions listed above are satisfied because the court summarily dismissed the motion. If Kelsey prevails on this equal protection attack on the statute and we extend the statute to those convicted of his crime and serving a similar sentence to his, he will be entitled to a remand of the issue to the district court for a hearing to determine whether he can establish these three statutory conditions.

Historically, our Kansas Supreme Court has on three occasions examined this statute when it was dealing with equal protection questions—*Denney*, 278 Kan. 643; *Salas*, 289 Kan. 245; and *Cheeks*, 298 Kan. 1. Collectively, the opinions give us clear guidance on how to proceed in this case. In looking for similarities, the court, at first, examined the elements of the crimes charged but has since moved on to an examination of the terms of the different offenders' sentences. Reading these opinions makes it clear that the sentences being served by the offenders are now determinative of our inquiry.

6

First, in *Denney*, the Supreme Court held that K.S.A. 21-2512 violated the Equal Protection Clause for offenders convicted of aggravated criminal sodomy involving penetration of another female bodily orifice by the male sex organ. 278 Kan. at 649-61. The court entertained the question for the first time on appeal as it was not raised in Denney's pro se motion to the district court.

The *Denney* court focused on the similarity of the elements between the crimes of rape and aggravated criminal sodomy under the facts of that case and found no rational basis for differing treatment existed. The court concluded that Denney committed his crime by penetrating his victims' anuses with his male sex organ, a crime the court found to be arguably indistinguishable from an offender convicted of rape by penetrating a female sex organ with his male sex organ. 278 Kan. at 653-54. Going further, the court rejected arguments that a rational basis for differing treatment could be based on the cost of testing or the differential of the severity levels of rape and criminal sodomy. 278 Kan. at 651-56.

To remedy the constitutional violation, the court declined to strike down K.S.A. 21-2512. Instead, it *extended* the statute to include postconviction DNA testing for offenders in a similar situation as Denney's. *Denney*, 278 Kan. at 660. Obviously, the similarity of the criminal acts and elements of the crimes were uppermost in the court's analysis in *Denney*.

Next, in *Salas* our Supreme Court again focused on the elements of two crimes—premeditated first-degree murder and intentional second-degree murder. Limiting itself to considering only the offenders that Salas claimed to be similarly situated, the court held that K.S.A. 21-2512 providing postconviction DNA testing if an offender is convicted of first-degree premeditated murder does not violate equal protection by not extending the same right to offenders convicted of intentional second-degree murder. 289 Kan. at 249-51. The court concluded that offenders who commit first-degree murder with

7

*premeditation* are not similarly situated to those offenders convicted of *intentional* second-degree murder. The difference is the premeditation element, which the court considered to be a rational basis for differing treatment. 289 Kan. at 250-51.

Finally, in *Cheeks* the court addressed the equal protection challenge left unanswered in *Salas*—a challenge not based on the elements of the crimes of second-degree murder and first-degree premeditated murder, but based on the punishment imposed for both crimes. Because Cheeks framed his "similarly situated" analysis on the punishment imposed for the crime—not the elements of the crime or the conduct that violates those elements—*Salas* did not control the court's decision in *Cheeks*. 298 Kan. at 6.

Instead, the court held that because Cheeks received the maximum indeterminate sentence of 15 years to life for second-degree murder, he was similarly situated to offenders convicted of first-degree premeditated murder who received a life sentence. Those offenders were also parole eligible after 15 years, but they could petition for postconviction DNA testing under K.S.A. 21-2512. *Cheeks*, 298 Kan. at 7. The court, citing *Denney*, concluded no rational basis existed for the differing treatment of similarly situated offenders under K.S.A. 21-2512. The court once again found the statute was unconstitutional and *expanded* the statute to include those offenders convicted of second-degree murder and receiving the presentencing guidelines maximum penalty of 15-years-to-life imprisonment. *Cheeks*, 298 Kan. at 8-13.

*How Kelsey frames his argument is important to our inquiry.*

Kelsey asks us to expand K.S.A. 21-2512 to those offenders convicted under K.S.A. 21-3504(a)(3)(A). He cites *Cheeks* for support. He contends the similarly situated class is defined by the sentence received:

8

"[Kelsey's] conviction for aggravated indecent liberties . . . places him in a strikingly similar position for length of sentence comparison, relative to those individuals convicted of rape and aggravated criminal sodomy, just as Mr. Cheeks' sentence for second degree murder placed him in a similar position relative to those serving sentences for first degree murder."

In setting these narrow limits, Kelsey is arguing that offenders who receive a mandatory hard 25 life sentence under K.S.A. 21-4643 for committing aggravated indecent liberties with a child under the age of 14 in violation of K.S.A. 21-3504(a)(3)(A) are similarly situated to individuals sentenced for rape under K.S.A. 21-3502 and aggravated criminal sodomy under K.S.A. 21-3506. Thus, because Kelsey is framing the relevant distinction for our "similarly situated" analysis on the sentence the district court imposed, not the elements of the crimes or the conduct violating those elements, *Cheeks* controls our decision in this case. See 298 Kan. at 6-7.

In opposition, the State declines to apply an equal protection analysis under *Cheeks*. The State simply suggests this court find the dissenting opinions in *Cheeks* more persuasive than the majority opinion. However, as the State also acknowledged in making this suggestion, this court is duty bound to follow Kansas Supreme Court precedent, unless there is some indication the court is departing from its previous position. *State v. Ottinger*, 46 Kan. App. 2d 647, 655, 264 P.3d 1027 (2011), *rev. denied* 294 Kan. 946 (2012). We have found no indication of an intention to depart.

Accordingly, we must decide whether Kelsey has met the threshold requirement by proving he is similarly situated to a group covered under the statute. See *Cheeks*, 298 Kan. 1, Syl. ¶ 2. We hold he has done so.

9

*A review of the sentencing statutes is helpful.*

A person 18 or older convicted of aggravated indecent liberties with a child under the age of 14 in violation of K.S.A. 21-3504(a)(3)(A) is guilty of an off-grid person felony requiring a mandatory life sentence with no possibility of parole for 25 years. K.S.A. 21-4643(a)(1)(C). Rape and aggravated criminal sodomy are similarly off-grid person felonies when the victim is under the age of 14 and the offender is 18 years of age or older. K.S.A. 21-3502(c); K.S.A. 21-3506(c). Therefore, an offender 18 years of age or older convicted under K.S.A. 21-3502(a)(2) or K.S.A. 21-3506(a)(1) or (a)(2) also receives a mandatory life sentence with no possibility of parole for 25 years. K.S.A. 21-4643(a)(1)(B), (D).

The length of sentences imposed for a conviction under the remaining categories of rape and aggravated criminal sodomy vary with the criminal history of the offender. A person convicted of rape under K.S.A. 21-3502(a)(1) or (a)(2) is guilty of a severity level 1 person felony, except, as provided above, under subsection (a)(2) when the offender is 18 years of age or older, whereas rape as described under K.S.A. 21-3502(a)(3) or (a)(4) is a severity level 2 person felony. K.S.A. 21-3502(c). And, except as provided above, all other convictions for aggravated criminal sodomy are severity level 1 person felonies. K.S.A. 21-3506(c). Therefore, a severity level 1 rape/aggravated criminal sodomy conviction and a severity level 2 rape conviction has a presumptive sentencing range from 117 months and 155 months respectively for criminal history category I at the low end of the sentencing grid, to 467 months and 620 months respectively for criminal history category A at the high end. See K.S.A. 21-4704(a).

Given these vast sentencing ranges that are dependent upon an offender's criminal history, it could be argued that a person sentenced under K.S.A. 21-3504(a)(3)(A) is not similarly situated to certain individuals requesting postconviction DNA testing after being sentenced for rape or aggravated criminal sodomy at the high end of the sentencing

grid—467 or 620 months. On the other hand, K.S.A. 21-2512 does permit postconviction DNA testing for offenders receiving considerably *less* than the sentence for an off-grid person felony under K.S.A. 21-3504(a)(3)(A).

More importantly, when a district court imposes the mandatory off-grid sentence for a Jessica's Law conviction of aggravated indecent liberties in violation of K.S.A. 21-3504(a)(3)(A), the offender who is 18 years of age or older receives the identical sentence as if convicted of rape under K.S.A. 21-3502(a)(2) or aggravated criminal sodomy under K.S.A. 21-3506(a)(1) or (a)(2).

Staying within the limits set by Kelsey's argument, we hold that the narrow class of offenders sentenced under Jessica's Law for aggravated indecent liberties with a child under the age of 14 are similarly situated to offenders sentenced for rape or aggravated criminal sodomy and serving hard 25 life sentences. Kelsey has met the threshold requirement.

Moving to the remaining steps of our analysis, since there is no indication our Supreme Court is departing from *Cheeks*, we remain constrained by the court's conclusion regarding the rational basis analysis and the remedy for an equal protection violation. See *Cheeks*, 298 Kan. at 8-13.

We employ the rational basis test because that is what the Supreme Court used in both *Denney*, 278 Kan. at 651-52, and *Cheeks*, 298 Kan. at 8. Therefore, Kelsey must meet his burden by negating "'"every conceivable [reasonable] basis which might support"' the differing treatment." *Cheeks*, 298 Kan. at 8. Indeed, the *Cheeks* court clarified that in considering the possible rational bases offered, the means and the classification of the statute in question must meet a legitimate legislative goal:

11

"We do not focus on the legislature's actual rationale for the classification. Rather, we consider whether the legislature could have had a legitimate reason for drawing the challenged classification. [Citation omitted.] To pass the rational basis test, the statute must foster legitimate goals and the means chosen to achieve the state's goals must 'bear a rational relationship to those goals.' [Citation omitted.] In other words, the proffered rational basis must be more than simply a legitimate legislative goal, the '"'"*classification* [must] bear [ ] some reasonable relationship to a valid legislative objective."'"' (Emphasis added.) [Citations omitted.] Put another way, the proffered rational basis must both explain the distinction drawn by the statute between two classes of individuals *and* be a legitimate legislative objective." 298 Kan. at 8.

Kelsey simply cites *Cheeks*, where the court considered and rejected both the cost of the testing and the severity levels of the crimes as reasons to justify excluding second-degree murder. 298 Kan. at 8-9.

We assume that the cost of the DNA testing here would be the same as in *Cheeks*, where the court rejected the cost of testing as a legitimate rationale for differing treatment. We do so as well. See 298 Kan. at 9; *Denney*, 278 Kan. at 654. We focus then on severity levels.

In the earliest case dealing with this issue—*Denney*—our Supreme Court in searching for a rational basis *sua sponte* looked at severity levels of the crimes and suggested, "the legislature may have intended to allow postconviction DNA testing based on the severity of the crime." 278 Kan. at 654. In examining the differences between a severity level 2 felony for aggravated criminal sodomy and a severity level 1 felony for rape by force or fear, the court acknowledged, "differences in severity level could be a rational basis for distinguishing between when [postconviction] DNA testing is allowed and when not." *Denney*, 278 Kan. at 655.

However, citing K.S.A. 21-4707(a), which provides that "[c]rimes listed within each [severity] level are considered to be relatively equal in severity," the court rejected the rational basis of crime severity level given that, *in some instances*, aggravated criminal sodomy had the same severity level as rape. *Denney*, 278 Kan. at 655-56.

Then, more recently, in *Cheeks*, our Supreme Court rejected the State's suggestion that the severity of the crime was a rational basis to exclude second-degree murder from K.S.A. 21-2512 for the same reason used in *Denney.* Citing K.S.A. 2012 Supp. 21-6807(a), the court pointed out that even though first-degree murder was classified as an off-grid felony when the legislature enacted K.S.A. 21-2512, the legislature included rape as a crime eligible for postconviction DNA testing and that both rape and second-degree murder, both being level 1 or 2 person felonies, were "'relatively equal in severity.'" *Cheeks*, 298 Kan. at 10. In other words, similar does not mean identical when focusing on severity levels of crimes when making this type of analysis.

We are constrained to follow the ruling in *Cheeks*. As the Supreme Court did in *Cheeks*, we find no legitimate legislative goal that is met by this distinction in severity levels of the crimes for the purpose of an equal protection analysis. Given Kansas' obvious commitment to exoneration of the innocent through DNA—both sampling and later testing—and following our Supreme Court's lead in extending K.S.A. 21-2512 rather than nullifying the statute in such instances as here, we likewise extend K.S.A. 21-2512 to include testing for those in the same situation as Kelsey. See *Cheeks*, 298 Kan. at 12; *Denney*, 278 Kan. at 660.

In so holding, we clarify that, like *Cheeks*, we are not adding a new crime to the statute's coverage but are expanding the statute to cover a much narrower class of offenders, *i.e.*, offenders convicted of aggravated indecent liberties with a child under the age of 14 and sentenced under Jessica's Law to the mandatory hard 25 life sentence. Since the district court summarily rejected Kelsey's motion based on the face of the

13

statute and made no findings regarding the three statutory requirements of K.S.A. 21-2512(a), Kelsey is only entitled to a remand to the district court for a hearing to determine whether he can establish those three statutory requirements. See *Cheeks*, 298 Kan. at 4.

Reversed and remanded for additional findings.

\* \* \*

ATCHESON, J., concurring:  Jason D. Kelsey has a right to seek DNA testing to challenge his convictions for aggravated indecent liberties with a child because the Jessica's Law sentence he received makes him materially indistinguishable from criminals statutorily entitled to request such testing under Kansas law. K.S.A. 21-2512. The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution requires that sort of consistency in a state's extension of rights or benefits. I agree with Judge Hill's conclusion grounded in the Equal Protection Clause. But the Kansas courts take an odd approach to analyzing equal protection claims by imposing a requirement that those persons asserting a denial of a government right or benefit first demonstrate they are "similarly situated" to those receiving the right or benefit. That potentially dispositive threshold test has crept fog-like into our cases on little cat feet. It hasn't a basis in generally accepted equal protection jurisprudence, and akin to a morning fog, it obscures the landscape to no particularly useful ends and conceivably dangerous ones.

The Equal Protection Clause prevents state and local governments from treating groups of people differently, whether through legislative enactment or other policies and practices, without some justification. See *Engquist v. Oregon Dept. of Agriculture*, 553 U.S. 591, 601, 128 S. Ct. 2146, 170 L. Ed. 2d 975 (2008) ("Our equal protection jurisprudence has typically been concerned with governmental classifications that 'affect

14

some groups of citizens differently than others.'") (quoting *McGowan v. Maryland*, 366 U.S. 420, 425, 81 S. Ct. 1101, 6 L. Ed. 2d 393 [1961]); *Reed v. Reed*, 404 U.S. 71, 75-76, 92 S. Ct. 251, 30 L. Ed. 2d 225 (1971) ("The Equal Protection Clause . . . den[ies] to States the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute."); *Jurado v. Popejoy Constr. Co.*, 253 Kan. 116, 123, 853 P.2d 669 (1993) ("[E]qual protection requires . . . that legislative classifications be reasonable, not arbitrary, and that they be justified by legitimate legislative objectives."); see also *Fitzgerald v. Barnstable School Comm.*, 555 U.S. 246, 257, 129 S. Ct. 788, 172 L. Ed. 2d 582 (2009) (Equal Protection Clause applies to public school admissions policies). The nature of the classification or division dictates the degree of justification the governmental entity must advance for its action. The United States Supreme Court has recognized three levels of review or scrutiny for equal protection challenges.

When a government classification burdens a fundamental right or divides based upon characteristics considered inherently suspect in granting benefits or imposing burdens—including race, national origin, and alienage—courts apply the most rigorous review, commonly known as strict scrutiny. A classification survives strict scrutiny only if it furthers compelling government interests and is narrowly tailored to advance those interests. *Plyler v. Doe*, 457 U.S. 202, 216-17, 102 S. Ct. 2382, 72 L. Ed. 2d 786 (1982); *Zablocki v. Redhail*, 434 U.S. 374, 388, 98 S. Ct. 673, 54 L. Ed. 2d 618 (1978); *Bostic v. Schaefer*, 760 F.3d 352, 375 & n.6 (4th Cir. 2014); *Kitchen v. Herbert*, 755 F.3d 1193, 1218 (10th Cir. 2014). A few other group characteristics, notably gender and illegitimacy, have been treated as "quasi-suspect," invoking a heightened level of judicial review, though less demanding than strict scrutiny. See *Clark v. Jeter*, 486 U.S. 456, 461, 108 S. Ct. 1910, 100 L. Ed. 2d 465 (1988); *Hayden v. Greensburg Community School*, 743 F.3d 569, 577 (7th Cir. 2014) (gender); *Pierre v. Holder*, 738 F.3d 39, 50 (2d Cir. 2013) (gender and legitimacy). Courts require statutes distinguishing among people on quasi-suspect bases to be "substantially related to an important governmental objective." *Clark*,

486 U.S. at 461; see *Morales-Santana v. Lynch*, ___ F.3d ___, 2015 WL 4097296, at \*5 (2d Cir. 2015). That requires the actual purpose for or justification of the statute's differential treatment to be "exceedingly persuasive." *United States v. Virginia*, 518 U.S. 515, 532-33, 116 S. Ct. 2264, 135 L. Ed. 2d 735 (1996); see *Morales-Santana*, 2015 WL 4097296, at \*5; *Hayden*, 743 F.3d at 577. But most economic and social regulation affects neither a fundamental right nor a protected class characteristic. In those instances, courts apply a relaxed, "rational basis" review to an equal protection challenge. See *Vacco v. Quill*, 521 U.S. 793, 799, 117 S. Ct. 2293, 138 L. Ed. 2d 834 (1997); *Kwong v. Bloomberg*, 723 F.3d 160, 172 (2d Cir. 2013). A government classification survives rational basis review if "'a plausible policy reason'" supports the scheme and it is not so removed from that reason as to result in an "'arbitrary or irrational'" distinction. *Fitzgerald v. Racing Assn. of Central Iowa*, 539 U.S. 103, 107, 123 S. Ct. 2156, 156 L. Ed. 2d 97 (2003) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 11-12, 112 S. Ct. 2326, 120 L. Ed. 2d 1 [1992]); see *Heller v. Doe*, 509 U.S. 312, 319-20, 113 S. Ct. 2637, 125 L. Ed. 2d 257 (1993); *State v. Cheeks*, 298 Kan. 1, 9, 310 P.3d 346 (2013). The statute or other regulation may be upheld for any justifiable purpose; the purpose need not be the one that prompted its adoption. See *McDonald v. Board of Election*, 394 U.S. 802, 809, 89 S. Ct. 1404, 22 L. Ed. 2d 739 (1969); *Estate of Kunze v. Commissioner of Internal Revenue*, 233 F.3d 948, 954 (7th Cir. 2000).

The United States Supreme Court has been clear about how equal protection challenges should be analyzed. A court should first determine the appropriate level of review:  rational basis, intermediate scrutiny, or strict scrutiny. And the court should then apply that standard to evaluate the constitutional propriety of the governmental classification in light of the regulatory purposes or objectives. See *Armour v. City of Indianapolis*, 566 U.S. ___, 132 S. Ct. 2073, 2079-81, 182 L. Ed. 2d 998 (2012); *Attorney General of N.Y. v. Soto-Lopez*, 476 U.S. 898, 906 & n.6, 106 S. Ct. 2317, 90 L. Ed. 2d 899 (1986) (plurality); 476 U.S. at 924 (O'Connor, J., dissenting, joined by Rehnquist, J. and Stevens, J.); *Dunn v. Blumstein*, 405 U.S. 330, 335, 92 S. Ct. 995, 31 L.

16

Ed. 2d 274 (1972). The Court does not engage in a preliminary inquiry asking whether the groups created by a statute are "similarly situated" (and, in turn, dispense with any further analysis if they are not). In *San Antonio School District v. Rodriguez*, 411 U.S. 1, 17, 93 S. Ct. 1278, 36 L. Ed. 2d 16 (1973), the Court outlined the appropriate approach to an equal protection challenge:

> "We must decide, first, whether the Texas system of financing public education operates to the disadvantage of some suspect class or impinges upon a fundamental right explicitly or implicitly protected by the Constitution, thereby requiring strict judicial scrutiny. . . . If not, the Texas scheme must still be examined to determine whether it rationally furthers some legitimate, articulated state purpose and therefore does not constitute [a] . . . violation of the Equal Protection Clause of the Fourteenth Amendment."

To arrive at the correct level of scrutiny, a court necessarily must assess how the governmental action classifies, thereby defining the characteristics that set the disadvantaged group apart from the benefited group or identifying a fundamental right that has been impinged. But that is nothing like a potentially dispositive comparison of the groups to decide if they are somehow sufficiently similar.

For the most part, lower courts define the first task in equal protection analysis to be a determination of the applicable degree of scrutiny—to the extent they explicitly describe the sequencing of the steps at all. See, *e.g.*, *Connelly v. Steel Valley School Dist.*, 706 F.3d 209, 213 (3d Cir. 2013) ("We begin by considering which equal protection standard governs our review. . . . "); *Doe v. Pennsylvania Bd. of Probation and Parole*, 513 F.3d 95, 107 (3d Cir. 2008) ("In reviewing a claim that government action violates the Equal Protection Clause, we must first determine the appropriate standard by which we are to review the claim."); *Hedgepeth v. Washington Metropolitan Area Transit Authority*, 386 F.3d 1148, 1153 (D.C. Cir. 2004) ("The first step in analyzing [the] claim that this disparate treatment violated equal protection is to determine the proper level of scrutiny."); *Breck v. State of Michigan*, 203 F.3d 392, 395 (6th Cir. 2000); *Richard v.*

17

*Hinson*, 70 F.3d 415, 417 (5th Cir. 1995).[1] The Kansas Supreme Court has described the analytical method that way, too. See, *e.g.*, *Gleason v. Samaritan Home*, 260 Kan. 970, 988, 926 P.2d 1349 (1996) ("The first step in an equal protection analysis is determining which level of scrutiny to apply to a statute which distinguishes between classes of individuals."); *Bair v. Peck*, 248 Kan. 824, 830, 811 P.2d 1176 (1991).

[1]In the for what it's worth department, Chief Justice of the United States John Roberts wrote *Hedgepeth* during his time on the federal appellate bench.

The Kansas Supreme Court, however, has drifted from that established equal protection jurisprudence to incorporate a new threshold test requiring that the constituents of the classifications created by a statute or other government action be "similarly situated" to advance a constitutional claim. The origins of that criterion are murky. And, as I discuss, the notion serves no useful purpose. The court recognized the proposition in *State v. Salas*, 289 Kan. 245, 248, 210 P.3d 635 (2009), and cited *Hodges v. Johnson*, 288 Kan. 56, 72, 199 P.3d 1251 (2009), *State v. Denney*, 278 Kan. 643, 652, 101 P.3d 1257 (2004), and *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985), for support.

But *Hodges* neither directly states nor actually applies such a test. In *Denney*, the court considered an equal protection challenge from an individual convicted of aggravated sodomy who wanted postconviction testing of DNA evidence, although K.S.A. 21-2512 granted testing only to persons convicted of rape and murder. The court undertook an initial comparison of the elements of aggravated criminal sodomy applicable to Denney, pronounced them "arguably indistinguishable" from the elements of rape, and then extended DNA testing to Denney because the legislative classification permitting testing in rape convictions but not convictions for at least some forms of sodomy lacked any rational basis. *Denney*, 278 Kan. at 652-54, 656. The *Denney* decision cited no authority for its "threshold" examination of the elements of the crimes as a prerequisite to the traditional equal protection analysis. 278 Kan. at 653-54. The

18

comparison of the statutory elements would have been a significant part of a traditional analysis—if the elements of the crimes were markedly different, that would likely provide a rational basis for the legislature allowing DNA testing for convictions of one and not the other.

In outlining the applicable constitutional principles, *Denney* relies almost exclusively on *Mudd v. Neosho Memorial Regional Med. Center*, 275 Kan. 187, 62 P.3d 236 (2003). But *Mudd* uses traditional equal protection analysis identifying the level of scrutiny and then assessing the appropriateness of the governmental classification in light of that standard. 275 Kan. at 197-200. The case does not suggest some preliminary step based on a comparison of the attributes of the constituents in the groups created by the classification.

In *Cleburne*, 473 U.S. at 439, the Court described the Equal Protection Clause as "essentially a direction that all persons similarly situated should be treated alike." The description, however, summarized the purpose of the provision rather than an analytical tool for assessing an asserted equal protection violation. The Court, however, did turn immediately to a discussion of those tools and outlined, among other things, rational basis review, intermediate scrutiny, and strict scrutiny. 473 U.S. at 439-42. But the Court never mentioned a threshold requirement for a comparison establishing substantial similarity across the governmental classification or how that comparison might be undertaken. Nor did it make such a comparison in deciding the equal protection issue.

The Kansas Supreme Court also used a threshold "similarly situated" test in *In re Tax Appeal of Weisgerber*, 285 Kan. 98, 106, 169 P.3d 321 (2007), ostensibly because the Equal Protection Clause prohibits government regulation treating "'arguably indistinguishable' classes of people differently." (Quoting *Ross v. Moffitt*, 417 U.S. 600, 609, 94 S. Ct. 2437, 41 L. Ed. 2d 341 [1974].) The court also cited *Reed*, 404 U.S. at 75-76, as supporting that approach. But *Ross* and *Reed*—like *Cleburne*—simply summarized

the constitutional right afforded in the Equal Protection Clause and not the analytical method for evaluating those claims. In fact, the classes can be different in ways having nothing to do with the government's purpose in creating the classification itself and nonetheless violate the Equal Protection Clause. A classification runs afoul of the constitutional protection if, taking account of the applicable level of scrutiny, the classes created cannot be fairly distinguished with respect to the benefit bestowed or the burden imposed. The *Reed* decision said as much:  "A classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.'" 404 U.S. at 76 (quoting *Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S. Ct. 560, 64 L. Ed. 989 [1920]).

More recently, the Kansas Supreme Court has continued to apply a gatekeeper "similarly situated" test for equal protection claims by citing its own cases coming after *Weisgerber* and *Salas* as authority. See, *e.g.*, *Miller v. Johnson*, 295 Kan. 636, 666, 289 P.3d 1098 (2012) (citing *Board of Miami County Comm'rs v. Kanza Rail-Trails Conservancy, Inc.*, 292 Kan. 285, 315, 255 P.3d 1186 [2011]; *State v. Huerta*, 291 Kan. 831, 834, 247 P.3d 1043 [2011]); *Kanza Rail-Trails Conservancy, Inc.*, 292 Kan. at 315 (citing *Salas*, 289 Kan. at 248); *Huerta*, 291 Kan. at 834 (citing *Salas*, 289 Kan. at 248). That sort of repetition doesn't strengthen an otherwise doubtful rule, especially one construing federal constitutional law.[2]

[2]Also in the for what it's worth category, the Kansas Supreme Court suggested a "similarly situated" prerequisite for equal protection claims in *Bonin v. Vannaman*, 261 Kan. 199, 223, 929 P.2d 754 (1996), and *Smith v. Printup*, 254 Kan. 315, 321-22, 866 P.2d 985 (1993). In *Bonin*, Justice Abbott cited only *Smith* for that notion. And in *Smith*, Justice Davis cited no direct authority in affirming the dismissal of an equal protection claim in two paragraphs. But several years later in *Gleason*, 260 Kan. at 988, Justice Davis expressly outlined and applied a traditional equal protection analysis beginning with an identification of the governing level of scrutiny. Justice Abbott, however, continued to treat the "similarly situated" test as the initial step in equal protection analysis. See *Injured Workers of Kansas v. Franklin*, 262 Kan. 840, 857, 942 P.2d 591

(1997) (obliquely referring to *Smith*, 254 Kan. at 321, but citing no other authority). Threads of *Smith* influenced the court in *Weisgerber*, 285 Kan. at 104, 107. The Kansas courts have hopscotched around in addressing the analytical model for equal protection claims over the past quarter century.

The Kansas Supreme Court, however, is not alone in that respect. For example, some panels of the United States Court of Appeals for the Fourth Circuit use a comparable "similarly situated" test as the initial step in assessing equal protection claims. See *Sansotta v. Town of Nags Head*, 724 F.3d 533, 542 (4th Cir. 2013); *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). Other panels do not and, rather, adhere to conventional equal protection analysis. See *United States v. Timms*, 664 F.3d 436, 445 (4th Cir. 2012); *Greenville Women's Clinic v. Bryant*, 222 F.3d 157, 203 (4th Cir. 2000). The *Morrison* decision appears to be the fountainhead for the test. The panel cited *Cleburne*, 473 U.S. at 439-40, and two earlier Fourth Circuit cases as authority. But *Cleburne* does not recognize or support the notion. Nor do the earlier circuit cases. *In re Long Term Administrative Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 471 (4th Cir. 1999) (equal protection claim properly dismissed because plaintiffs failed to show any disparate treatment); *Sylvia Development Corp. v. Calvert County, Md.*, 48 F.3d 810, 818-20 (4th Cir. 1995) (government action must purposefully classify in an impermissible way to violate Equal Protection Clause).

The United States Supreme Court neither endorses nor applies the analytical approach the Kansas Supreme Court now follows. If *Cleburne*, *Ross*, or *Reed* actually imposed an initial "similarly situated" requirement, the Court would have used that criterion in deciding later equal protection cases. But plainly, the Court has not. There isn't a hint of such a condition in its decisions. See *Armour*, 132 S. Ct. at 2079-80; *Romer v. Evans*, 517 U.S. 620, 631, 116 S. Ct. 1620, 134 L. Ed. 2d 855 (1996). The ruling in *Cleburne* actually contravenes the notion. 473 U.S. at 447-48 (Although recognizing the intellectually disabled "as a group are indeed different from others not sharing their misfortune," the Court found no rational basis for a municipal regulation requiring a special use permit for a group home for the intellectually disabled when no comparable approval was necessary for other communal housing arrangements including convalescent or nursing homes, sororities and fraternities, and boarding houses.).

21

Ultimately, a state court cannot add a potentially dispositive element to federal equal protection law any more than it could jettison strict scrutiny or declare sex to be a classification undeserving of heightened review. See *State v. Lawson*, 296 Kan. 1084, 1089, 297 P.3d 1164 (2013) (United States Supreme Court decisions controlling on matters of federal constitutional law); *State v. Galaviz*, 296 Kan. 168, 180, 291 P.3d 62 (2012).

In most equal protection cases, the Kansas analytical model—requiring an initial showing that the government action results in "similarly situated" classes—probably makes no difference in the outcome. That would be true here. But the added and potentially dispositive preliminary step is more than an academic exercise. Depending on how the test is supposed to be applied, it would make a substantive difference in some cases. And it necessarily distracts from and confounds a proper evaluation of equal protection claims.

If the similarly situated test applies to the overall characteristics of one class as compared to the overall characteristics of the other class or classes created by a statute or other governmental action, the standard would effectively terminate some equal protection claims that ought to go forward. That sort of comparison would be an abstract one unrelated to the purpose of the governmental classification. At least some of the Kansas caselaw suggests an abstract comparison. See *Salas*, 289 Kan. at 251; *Weisgerber*, 285 Kan. at 106.

Under that approach, for example, *Cleburne* presumably would have come out differently. As I have indicated, the Court determined that intellectually disabled adults, as a group, differed significantly from those with roughly normal intellectual capacity. See *Cleburne*, 473 U.S. at 448. Under the Kansas criteria for analyzing equal protection challenges—assuming the initial comparison to be an abstract one—that should have ended the case in the city's favor. But, of course, the Court found an equal protection

violation, precluding the city from enforcing its permit requirement against the group home.

Similarly, in *Heller v. Doe*, 509 U.S. 312, 113 S. Ct. 2637, 125 L. Ed. 2d 257 (1993), the United States Supreme Court considered an equal protection challenge to Kentucky's involuntary commitment procedures because, among other differences, they imposed a more rigorous standard of proof for committing the mentally ill than for the intellectually disabled. The Court recognized substantial differences between the mentally ill as a class and the intellectually disabled as a class, particularly concerning institutional care and treatment. 509 U.S. at 326-28. But that recognition did not terminate the case. The Court reviewed the differences in procedure using a rational basis test and found them to be constitutionally permissible under the Equal Protection Clause. 509 U.S. at 328.

The test would also seem to lead to doubtful results in some equal protection claims challenging sex-based classifications. Suppose, for example, a relatively small municipality required firefighters to meet specific strength and fitness standards to graduate from the training academy, and few women, even after the training, could do so. The fire chief proposed and the city commission adopted the standards to avoid hiring female firefighters because they thought it would be bad for departmental cohesiveness and would likely require at least some renovation of the fire station's facilities. So the municipality has a written policy allowing only men between 19 and 26 years old to apply to be firefighters. A woman files suit attacking the men-only application criterion as an equal protection violation. The government regulation plainly creates a disfavored class of women and a favored class of men—with a purpose of denying a benefit to women based on their sex. But men and women arguably aren't similarly situated. They have demonstrable anatomical differences. And they have significantly different roles in the procreative process. Normatively, men are, in fact, bigger and stronger than women. Some women are fitter and stronger than some men, and some (but not very many)

women could meet the municipality's training standards. Arguably, at least, those differences would be enough to cut off the equal protection claim under the Kansas test.

But doing so would eliminate any consideration of the heightened, intermediate scrutiny required for classifications based on sex. The more rigorous equal protection review likely would defeat the municipality's argument that the men-only policy promotes administrative convenience and saves costs because few women could meet the strength and fitness requirements even with training, so permitting them to apply at all would be wasteful. The physical requirements themselves could be attacked under the heightened standard as a product of intentional discrimination rather than as job-appropriate in some rational way. The equal protection claim would be a meritorious one.[3]

[3]The scenario also violates Title VII, 42 U.S.C. § 2000e *et seq.* (2012), prohibiting employment discrimination based on sex and other protected characteristics. But Title VII claims have a comparatively short limitations period and administrative exhaustion requirements that constitutional equal protection claims do not. Title VII also does not apply to very small employers. So an aggrieved party may have a viable equal protection claim without a companion Title VII claim. Liability issues aside, Title VII significantly limits noneconomic damages against smaller employers. 42 U.S.C. § 1981a(a)(1), (b)(3) (2012). There are no comparable caps on damages for equal protection violations by state governmental entities brought under 42 U.S.C. § 1983.

The Kansas test, then, could short-circuit proper equal protection review and has the potential to prematurely terminate legitimate claims. Moreover, the initial "similarly situated" determination seems to be one without an objective or even cognizable measure. That criterion looks to be an empty vessel in which a court can pour whatever it wants.

Even if the similarly situated criterion were to be applied within the context of the challenged governmental classification, so that the nature of the division and its ostensible purpose inform the determination, the test serves no good purpose. Evaluating the similarities and differences between the classes created by the government action

essentially replicates much of what a court is supposed to do under traditional equal protection analysis *after* establishing the appropriate level of scrutiny. See *Armour*, 132 S. Ct. at 2079-82 (Court reviews for rationality city's justifications for change in assessing costs of sewer projects, resulting in forgiveness of some property owners' unpaid assessments but no refunds to other property owners who had already paid assessments); *Rodriguez*, 411 U.S. at 17; *Reed*, 404 U.S. at 75-76. There is no reason for a court to take up part of that task before fixing the applicable scrutiny. Doing so, at the very least, fragments the analytical process without lending any clarity or other benefit to the decisionmaking. But in those cases calling for heightened scrutiny, the effect could be significantly distorting, since the court would be reviewing the impact of the governmental classification without fully considering whether the differences created are justified by especially persuasive reasons.

Today, I am comfortable that we have come to the correct conclusion in applying the Equal Protection Clause to the issue before us. But I would prefer following a path less foggy to get there.